Present: Hassell, C.J., Koontz, Kinser, Lemons, Goodwyn, and
Mims, JJ., and Lacy, S.J.

JOSHUA WAYNE ANDREWS

v. Record Nos. 100374 and 100375          OPINION BY
                                   JUSTICE LAWRENCE L. KOONTZ, JR.
                                          September 16, 2010
COMMONWEALTH OF VIRGINIA

          FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
                    Lon E. Farris, Judge[1]

     In this appeal, we review the four capital murder

convictions and death sentences imposed upon Joshua Wayne

Andrews for the murders of Romanno Avellino Head and Robert

Irvin Morrison.  Although we will affirm Andrews' convictions,

because of non-harmless errors that occurred during the

penalty-determination phase of the trial, we will vacate the

death sentences and remand the case for a new penalty-

determination proceeding.[2]

_____

     [1] As explained herein, Judge Rossie D. Alston, Jr.
presided at the trial of this case prior to his election as a
Judge of the Court of Appeals of Virginia.  Judge Farris
presided over the post-verdict proceedings, including the
review of the jury's verdict imposing the death sentences and
the entry of the sentencing order confirming that verdict.
     [2] Record number 100375 is the appeal of Andrews' 16 felony
convictions for malicious wounding, abduction, and various
firearms charges related to these crimes and to the capital
murders.  On February 26, 2010, we entered an order certifying
the appeal of these non-capital offenses from the Court of
Appeals and consolidated that appeal with the mandatory review
of the capital murder convictions and death sentences under
record number 100374.  On brief, Andrews does not expressly

I. BACKGROUND

Under familiar principles of appellate review, we will
state the evidence in the light most favorable to the
Commonwealth. Clagett v. Commonwealth, 252 Va. 79, 84, 472
S.E.2d 263, 265 (1996), cert. denied, 519 U.S. 1122 (1997).
On the evening of January 2, 2002, Andrews and Jamel Crawford
were at the apartment of Lavada Tucker in Alexandria. Andrews
told Crawford that he wanted to go to Head's apartment in
Prince William County to buy marijuana. Having no money,
Andrews and Crawford devised a plan to rob Head instead.
Andrews and Crawford asked Tucker to telephone Head at his
apartment in order to determine how many people were present
and whether he had marijuana there.

As Crawford was known to Head, the plan called for
Andrews initially to enter Head's apartment alone. Once the
occupants were in a secure area, Andrews was to signal
Crawford, who then would join him inside to search for money

---

seek to have his non-capital convictions overturned, and none
of his assignments of error presents a direct challenge to the
merits of the non-capital convictions. Since the errors that
occurred during the penalty-determination phase of the trial
affected only the sentences for the capital murder
convictions, the remand will likewise be limited to those
convictions. Accordingly, Andrews' convictions and sentences
for the non-capital offenses will be affirmed. See, e.g.,

2

and drugs.  Andrews was armed with a .25 caliber pistol and asked Crawford for his pistol, which Crawford testified was a .22 caliber.  Andrews cut "X's on the bullets," indicating that this would "break the bullets up" on impact to make them more lethal.  Andrews had both pistols when he and Crawford left for Head's apartment.

Morrison, who shared the apartment with Head, and their mutual friend Rutherford Berry were also at Head's apartment that evening.  According to Berry, Head received a telephone call from a woman, presumably Tucker, and told Berry that the woman was coming to the apartment.  Sometime later, Morrison, who was in the living room at the front of the apartment with Berry, responded to a knock at the door.  He was confronted by Andrews, who displayed one of the pistols and "slid in" the apartment through the open door.

Andrews demanded to know whether anyone else was in the apartment.  Morrison and Berry told Andrews that no one else was present, and Andrews ordered the two men to go down a hallway toward the back of the apartment.  As they did so, Head came out of one of the bedrooms.  Andrews ordered all

---

Yarbrough v. Commonwealth, 258 Va. 347, 353 n.1, 519 S.E.2d 602, 603 n.1 (1999).

three men to go into the bathroom.  He then demanded money and drugs.

Andrews ordered the three men to remove their clothes and to get into the bathtub.  He threw the clothing into the hallway and had a whispered conversation with Crawford, who had entered the apartment.  Andrews then ordered the men to "get down."  When Berry protested, Andrews shot Berry, who lost consciousness.  Crawford, who had moved toward the back of the apartment to search for money and drugs, fled the apartment when he heard multiple gunshots coming from the bathroom.  Andrews followed him, carrying a scale, a bag of marijuana, jewelry, and some clothing.

When Berry regained consciousness a short time later, he found that Head and Morrison had been shot multiple times and had fallen on top of him in the bathtub.  After extricating himself from the bathtub, Berry was able to call 911.  During the 911 call, Berry told the operator that "[a] couple of black males" had shot him.  Police arrived while Berry was still speaking to the 911 operator.  Rescue personnel also

4

arrived on the scene and transported all three victims to area hospitals.[3]

After leaving Head's apartment, Andrews and Crawford drove to a motel in Stafford County. On the way, Crawford asked Andrews why he shot the victims. Andrews told Crawford that "somebody in the bathroom didn't [comply] with what he said." Andrews later explained to Crawford that Andrews shot Berry when he refused to lean down in the bathtub beneath the other two men because "[h]e thought it was kind of homo." Andrews also said that he should have brought a sword because "it would have made less noise."

At the motel, the two men each rented a room. Although Andrews paid for his own room, he told the desk clerk to register both rooms in Crawford's name. Once in the room, Andrews burned IDs from Berry's wallet, which had been among the items taken from Head's apartment.

On January 4, 2002, Andrews robbed Gary Kennedy at a convenience store in Stafford County. Kennedy was shot during

---

[3] At trial, Berry testified that when he regained consciousness, Morrison was still "breathing and gurgling from blood," but Head "just wasn't there." However, the medical examiner's report indicates that Head was still alive and receiving CPR upon his arrival at Potomac Hospital where "he expired in the E[mergency ]R[oom]." Morrison was taken to Fairfax Hospital where he was pronounced dead.

the robbery, but survived.  On January 7, 2002, Andrews and Crawford went to a pawnshop and sold several pieces of jewelry, including a pendant that was subsequently identified as belonging to Morrison.

Although the record does not provide details of the pair's movement after visiting the pawnshop, sometime later on January 7, 2002 or early on January 8, 2002, Andrews and Crawford traveled to New York City.  In New York, Andrews and Crawford were involved in two more shootings.  They ultimately were arrested following a traffic stop when New York police discovered that they were wanted by the police in Virginia. Andrews subsequently was convicted in New York of two counts of attempted second degree murder arising from the shootings there.

The record does not disclose how police came to focus their inquiries on Andrews.  However, in the early afternoon of January 8, 2002, Detective Samuel E. Walker of the Prince William County Police Department swore out warrants of arrest before a magistrate charging Andrews with the murders of Head and Morrison and other felonies related to the January 2, 2002 incident.  At some point during that day, pursuant to a warrant, police conducted a search at the home of Andrews' mother, Imani Taymullah, where Andrews lived.  Taymullah and her husband told police that a .25 caliber Titan automatic

6

pistol was missing or had been stolen from their home.  Police obtained the serial number for the weapon and subsequently had that information entered into the National Crime Information Center (NCIC) database.[4]  Taymullah also told the police that Andrews had told her about the murders, describing the crime in graphic detail, though in doing so Andrews did not expressly admit to being the shooter.

Upon learning that Andrews had been arrested in New York City, Walker and another Prince William County police detective traveled there and interviewed Andrews about the January 2, 2002 murders as well as the murder of Clayton Kendall Breeding, who had been shot and killed in Prince William County on December 13, 2001.  Ultimately, statements made by Andrews during these interrogations were suppressed by the circuit court.

Walker was subsequently notified that, following an anonymous tip, New York police had recovered two .25 caliber weapons, one of which matched the information entered into the NCIC database.  Although Virginia authorities repeatedly

---

[4] The NCIC database is a computerized index of criminal justice information maintained by the Criminal Justice Information Services Division of the Federal Bureau of Investigation.  The NCIC database, among other things, consists of a file on stolen or missing weapons.

7

advised New York authorities that these weapons were potentially related to the three Virginia homicides for which Andrews was the principal suspect and were assured that the evidence would be preserved, in August 2005 New York authorities advised Walker that the guns had been destroyed.

The Commonwealth did not seek to indict Andrews until he had been returned in late March 2006 to Virginia from New York, following his convictions for the attempted murders committed there. On April 3, 2006, the Prince William County grand jury returned indictments against Andrews for three counts of capital murder and various associated felonies arising from the January 2, 2002 incident at Head's apartment. Two of the capital murder indictments charged Andrews with the murders of Head and Morrison respectively during the commission of robbery or attempted robbery, Code § 18.2-31(4), while the third charged Andrews with the capital murder of Head as part of the same act or transaction in which he murdered Morrison. Code § 18.2-31(7).

In addition to the indictments for the crimes committed on January 2, 2002 at Head's apartment, Andrews also was indicted for the capital murder of Breeding and associated felonies arising from that crime. The principal evidence linking Andrews to Breeding's murder was the result of forensic testing of the bullets recovered during Breeding's

8

autopsy, which established that they matched bullets recovered from the victims of the January 2, 2002 crimes.  The Commonwealth's theory supporting the capital murder indictment was that Andrews killed Breeding during a robbery or attempted robbery that possibly was drug-related.  Code § 18.2-31(4).  The circuit court ultimately struck the Commonwealth's evidence as to the charge of robbery of Breeding, and the Commonwealth conceded that absent proof of the predicate gradation offense, Andrews could at most be guilty of the first degree murder of Breeding.  However, the jury subsequently acquitted Andrews of Breeding's murder.

Andrews also was indicted for capital murder in violation of Code § 18.2-31(8).  The indictment for this charge stated that Andrews "did feloniously, willfully, deliberately and premeditatedly kill and murder more than one person within a three-year period, to wit: Clayton Breeding, Romann[o] Head, and Robert I. Morrison."

A jury trial on all these charges commenced on Friday, July 13, 2007.  As relevant to the issues raised in this appeal, the incidents of that trial, the circuit court's actions on certain preliminary matters that preceded it, and the post-verdict motions and sentencing will be detailed in the discussion of those issues below.  Thus, at this juncture, we need recount only a minimal outline of the proceedings in

9

order to place the discussion that follows in the proper context.

Following selection of the jury, the Commonwealth began presentation of its guilt-determination phase evidence on July 17, 2007. Evidence in accord with the above-recited facts was received from several police and crime scene investigation officers and from Berry and Crawford. The Commonwealth also called other witnesses, including the owner and an employee of the pawnshop where Andrews pawned jewelry five days after the January 2, 2002 murders, and Morrison's father, who identified his son's pendant that had been among the items pawned.

Autopsies performed on Head and Morrison showed that each had been shot four times. Head had been shot twice in the head and twice in the back. Both bullets from the gunshots to the back penetrated the right lung. Morrison was shot three times in the head and once in the chest. Dr. Francis Patricia Field, the assistant chief medical examiner for the Northern Virginia District Medical Examiner's Office, testified that both of the head wounds suffered by Head necessarily would have been fatal, while the wounds to the back "would not have been . . . immediately fatal," but would have resulted in death without medical intervention. Dr. Field further testified that two of Morrison's head wounds were necessarily

fatal, while the other head wound and the back wound were potentially fatal.

Gary Arntsen, a ballistic forensic scientist employed by the Commonwealth, testified concerning ballistic evidence derived from the bullets recovered during the autopsies of Head and Morrison and from Berry during surgery. Eight of the nine bullets recovered were fired from the same weapon, which Arntsen was able to positively identify as a .25 caliber Titan automatic pistol. The ninth, one of the bullets recovered during Head's autopsy, was fired from a .25 caliber Astra automatic pistol. Arntsen further testified that he examined eleven shell casings recovered by police at Head's apartment. All were for .25 caliber weapons. Eight of the shell casings had unique markings that "were consistent with having been fired from the Titan" though Arntsen conceded that he could not state with absolute certainty that the casings and the bullets were from the same weapon.

Police also recovered an unfired .25 caliber cartridge from Andrews' mother's home during the execution of the search warrant on January 8, 2002. Prior to trial, the Commonwealth and Andrews' counsel had stipulated to the admissibility of certain exhibits including this cartridge. When the Commonwealth sought to introduce the cartridge at trial, Andrews' counsel objected that the stipulation had been only

11

to the chain of custody for the exhibits, not to the foundation for their admissibility. The Commonwealth indicated that because of the stipulation, the Commonwealth had excused the officer who had recovered the cartridge during the search. The circuit court asked Andrews' counsel, "Is that going to be a problem?" Andrews' counsel responded, "I guess not, as long as I can check my notes on the stipulations," and then stated that the admission of the cartridge was "[w]ithout objection." Arntsen subsequently testified "with a full degree of scientific certainty" that this cartridge "had been cycled through . . . the same firearm" as the eight shell casings recovered from Head's apartment that were identified as having been fired from a .25 caliber Titan automatic pistol.

On the third day of testimony, the Commonwealth presented two fact witnesses in an attempt to establish that Andrews could have robbed and murdered Breeding; however, no direct evidence of Andrews' involvement in those crimes was presented. At the conclusion of the Commonwealth's evidence, Andrews moved to strike the evidence as to all the charges against him. As indicated above, the circuit court sustained the motion to strike with respect to the indictment for the robbery of Breeding, as well as for a use of a firearm charge associated with the robbery offense. With the Commonwealth's

12

concurrence, the court reduced the capital murder charge for the killing of Breeding in the course of a robbery or attempted robbery to first-degree murder, as the predicate gradation offense had not been proven.

Andrews elected not to introduce any evidence in the guilt-determination phase of his trial, except to have the court receive an exhibit. After Andrews' renewed motions to strike were denied, the case was submitted to the jury. Following two days of deliberations, the jury returned verdicts convicting Andrews of all the offenses arising from the events of January 2, 2002 and of capital murder of more than one person in a three-year period. However, as indicated above, the jury acquitted Andrews of the murder of Breeding. Despite that acquittal, Andrews did not expressly object at this juncture to his conviction for capital murder under Code § 18.2-31(8), nor did the Commonwealth seek to amend the indictment for that crime to delete the reference to Breeding as one of the persons murdered within the three-year period.

The presentation of evidence in the penalty-determination phase of the trial commenced on Wednesday, July 25, 2007. The Commonwealth presented all its witnesses on that day; however, because Andrews' witnesses would not be available until the following Monday, the circuit court recessed the trial until that day. During the recess, one of the jurors, Karen

13

Gahagen, returned to work where she was questioned about the ongoing trial by her employer and was asked by a co-worker, referring to Andrews, "why don't you just fry him?"

Andrews concluded the presentation of his penalty-determination phase evidence on August 1, 2007 and the case was submitted to the jury. On August 3, 2007, the jury recommended that Andrews receive a sentence of death for each of the four capital murder convictions, finding in each instance that Andrews posed a future danger to society and that the murders had been outrageously or wantonly vile.

Following the return of the jury's verdicts, the circuit court entered an order for the preparation of a pre-sentence report. While Andrews was awaiting sentencing, the defense became aware of the ex parte communications concerning the trial between Gahagen and her employer and the co-worker. On October 29, 2008, Andrews made a motion to set aside the verdicts and for a new trial on various grounds including a claim of juror misconduct (hereinafter, the "first new trial motion").

Also on October 29, 2008, Andrews filed a motion to set aside one of his convictions for capital murder and the death sentence imposed by the jury, contending that because he had been acquitted of Breeding's murder, he could not be guilty of a violation of Code § 18.2-31(8) based solely on the murders

14

of Head and Morrison. This was so, he contended, because multiple homicides that occur as part of the same act or transaction are subject to being charged as capital murder under Code § 18.2-31(7), for which he had also been convicted. Thus, Andrews maintained that in the absence of proof that he had committed some other, unrelated murder within three years, a conviction under Code § 18.2-31(8) would violate the double jeopardy prohibition of multiple punishments.[5]

At a hearing held December 8, 2008, the circuit court heard argument on both the first new trial motion and the motion to vacate the Code § 18.2-31(8) conviction. During this hearing, the court disposed of most of the claims made in the first new trial motion, but deferred ruling on the juror misconduct issue. With respect to the double jeopardy claim, the Commonwealth contended that the court did not need to vacate the conviction under Code § 18.2-31(8), but could instead impose a sentence of death "in the disjunctive" for the convictions under Code §§ 18.2-31(7) and -31(8). Noting

---

[5] Andrews also raised a double jeopardy argument in the first new trial motion. The thrust of that argument was that the circuit court erred in instructing the jury that it could impose four death sentences and sought, in concurrence with the other issues raised in the motion, to obtain either a new trial or a new penalty-determination phase as to all his convictions.

15

that the court had not yet determined whether to impose any sentence of death, the trial judge stated that "[t]he court holds that should the court make the determination the death penalty is appropriate in this case, let the sentencing order reflect that sanctions imposed under the jury's verdict addressing allegations under [Code §§ 18.2-31(7) and -31(8)] shall be in the disjunctive rather than the conjunctive."[6] However, the court did not subsequently memorialize this ruling in any order or otherwise take any formal action on the motion to set aside the Code § 18.2-31(8) conviction.

On January 9, 2009, the circuit court conducted a hearing to receive testimony from Gahagen concerning the <u>ex parte</u> communications with her employer and a co-worker during the recess of the penalty-determination phase of the trial. At the conclusion of this hearing, the court determined that the <u>ex parte</u> communications had not influenced Gahagen's decision to impose the death sentences on Andrews. On January 20,

---

[6] The colloquy among the parties and the court and the court's ruling were limited to what result would obtain if the court determined to imposed the death sentence for each offense. The court did not indicate that it would impose a life sentence "in the disjunctive" for each offense if it determined that the jury's sentence should be commuted.

2009, the court entered an order denying the first new trial motion.

On February 11, 2009, the General Assembly elected Judge Rossie D. Alston, Jr., the circuit court judge who had presided at Andrews' trial, to the Court of Appeals of Virginia for a term beginning March 1, 2009.  H. Res. 50, Va. Gen. Assem. (Reg. Sess. 2009).  Judge Lon E. Farris assumed responsibility for the case following Judge Alston's investiture as a Judge of the Court of Appeals.  On March 12, 2009 and May 18, 2009, Judge Farris presided at hearings on procedural matters in the case and subsequently entered orders memorializing the rulings from those hearings without objection from Andrews.

On October 19, 2009, the circuit court conducted a sentencing hearing at which it received the pre-sentence report and heard testimony from witnesses for the Commonwealth and Andrews.  During this hearing, Andrews raised for the first time the issue of whether Judge Farris could impose the death sentences when he had not presided at trial.  Citing Code § 19.2-154, Andrews contended in the alternative that either Judge Alston's elevation to the Court of Appeals would not qualify as a disability barring him from continuing to preside over the case or that if he was so barred, given the unique circumstances of a jury trial in a capital murder case

17

in which the court must determine whether to commute the jury's death sentence, the successor judge could not adequately familiarize himself with the record to make such determination.

At the conclusion of the hearing, after the circuit court had announced its intention to impose all four death sentences, the defense raised the issue of Judge Alston's prior ruling from the bench that a single death sentence would be imposed "in the disjunctive" for the convictions under Code §§ 18.2-31(7) and -31(8). Stating that Andrews' counsel should "have raised that at the beginning, not after I imposed the sentence," the court denied Andrews' motion to set aside one of the death sentences.

On October 26, 2009, the circuit court entered a final order imposing the four death sentences and terms of incarceration for the non-capital crimes in accord with the jury's verdicts. In that order, the court also overruled Andrews' objection to being sentenced by a judge who had not presided over his trial. Andrews filed written objections to the order and a second new trial motion on October 28, 2009. In the second new trial motion, Andrews reasserted that the court should vacate one of the death sentences, raised various objections to the conduct of the sentencing hearing, and sought a new trial based upon the "cumulative prejudicial

18

effect" of various alleged errors previously raised by Andrews. By an order entered November 2, 2009, the court denied the second new trial motion.

## II. QUESTIONS PRESENTED

On March 8, 2010, pursuant to Rule 5:22(b)[7] Andrews filed a notice of the "assignments of error upon which he intends to rely for the reversal of the conviction[s] or review of the sentence[s] of death" in this appeal. In that notice, Andrews lists 126 assignments of error; however only 45 of these assignments of error were set out in the opening brief.[8] In the opening brief, Andrews states twelve questions presented, indicating that most relate to several different assignments of error. These questions presented are:

> 1. Do the capital murder convictions of Andrews for both "multiple murder" under Va. Code § 18.2-31.7 [sic] and "serial murder" under Va. Code § 18.2-31.8 [sic] for the same underlying offenses violate the prohibition against double jeopardy?

---

[7] By order dated April 30, 2010, Rule 5:22 was amended effective July 1, 2010. The subject matter of former Rule 5:22(b) is currently addressed in Rule 5:22(c).

[8] The final two assignments of error listed in the opening brief, numbers 125 and 126, corresponded to the elements of the mandatory statutory review of Andrews' death sentences prescribed by Code § 17.1-313(C). However, Andrews' counsel failed to address the mandatory review issues in the opening brief. By an order dated April 30, 2010, we directed Andrews' counsel to address those issues in the reply brief.

2. Did the trial court err in denying Andrews' motion for a new trial after a member of his jury was subjected to prejudicial extraneous influence by her employer?

3. Did the trial court err in denying Andrews' request for an instruction informing the jury and requiring the prosecution to prove that he was a principal in the first degree for the murders of Romanno Head and Robert Morrison?

4. Did the introduction of an unadjudicated bad act committed by Andrews against his codefendant at the guilt-innocence phase of trial, to demonstrate consciousness of guilt, render the proceeding fundamentally unfair?

5. Did the trial court err in allowing the Commonwealth to introduce untested and unreliable ballistics evidence regarding guns that the defense had no opportunity to examine because they were destroyed?

6. Did the introduction of unsworn hearsay testimony regarding the destroyed guns violate Andrews' right of confrontation?

7. Did the introduction of victim impact testimony at the guilt-innocence phase and victim impact testimony regarding extraneous crimes at the sentencing phase of trial violate due process?

8. Did the court's exclusion of relevant mitigating evidence during the sentencing phase of trial violate Andrews' right to an individualized sentencing determination?

9. Did the trial court err in allowing the Commonwealth to violate the discovery order by providing late notice of unadjudicated criminal conduct and by denying a continuance?

10. Did the Commonwealth's references to facts not in evidence, references to Andrews as a "killing machine," and other improper arguments materially prejudice Andrews and deny him a fair trial?

11. Did the trial court err by removing a life-scrupled juror for cause on the basis that she would not impose a death sentence unless she was certain of the defendant's guilt?

12. Must a capital defendant be sentenced by the trial judge who presided over the evidence-taking proceedings?

Several of the 45 assignments of error actually set out in the opening brief that are designated as being referenced in one or more of the questions presented either are not addressed within the argument or are the subject of inadequate argument amounting to little more than an assertion that the circuit court's action was contrary to the law or the evidence. Lack of an adequate argument on brief in support of an assignment of error constitutes a waiver of that issue. Rule 5:17(c)(4); Rule 5:27;[9] Burns v. Commonwealth, 261 Va. 307, 318, 541 S.E.2d 872, 880, cert. denied, 534 U.S. 1043 (2001). Within our discussion of each of the questions

---

[9] Effective July 1, 2010, Rule 5:27 was amended to provide, without referring to the requirements of Rule 5:17, that "[t]he opening brief . . . must contain . . . [t]he standard of review, the argument, and the authorities relating to each assignment of error," and that "[w]ith respect to each assignment of error, the standard of review and the argument – including principles of law and the authorities – shall be stated in one place and not scattered through the brief." Rule 5:27(d). Subsequent references in this opinion to rules set out in Part Five of the Rules of Court refer to the versions of those rules in effect prior to July 1, 2010 during the proceedings in this case.

presented, we will indicate which assignments of error thus have been waived. Additionally, as indicated below, we need not address certain issues that have been wholly abandoned or that are mooted by the necessity to remand the case for a new penalty-determination proceeding. The remaining relevant questions presented will be addressed in two groups, first those pertaining to the guilt-determination phase of the trial followed by those pertaining to the penalty-determination phase, the issues within each group being addressed in the order they arose in that phase of the trial.

## III. ABANDONED AND MOOTED ISSUES

### A. Abandoned Issues

Because Andrews' counsel failed to include in his opening brief 81 of the assignments of error originally designated in the Rule 5:22(b) notice, we must conclude that counsel made an affirmative, strategic decision to abandon those issues. Additionally, Andrews listed in his opening brief the assignment of error designated as number 122. It does not appear that the subject of this assignment of error, which related to a limitation of witnesses Andrews was permitted to present at the sentencing hearing, is addressed within the opening brief. Accordingly, we hold that Andrews has waived the right to assert the issues raised in these 82 assignments of error as a basis for reversing his convictions and death

sentences.[10]  Rule 5:27(c)(4); Rule 5:27; <u>Porter v.</u>

<u>Commonwealth</u>, 276 Va. 203, 225, 661 S.E.2d 415, 424 (2008),

<u>cert. denied</u>, ___ U.S. ___, 129 S.Ct. 1999 (2009); <u>Teleguz v.</u>

<u>Commonwealth</u>, 273 Va. 458, 471, 643 S.E.2d 708, 717 (2007),

<u>cert. denied</u>, 552 U.S. 1191 (2008); <u>Elliott v. Commonwealth</u>,

267 Va. 396, 422, 593 S.E.2d 270, 286 (2004), <u>cert. denied</u>,

543 U.S. 1081 (2005).

### B. Issues Mooted by Remand

As indicated at the outset of this opinion and as will be
discussed below, non-harmless errors arising during the
penalty-determination phase of Andrews' trial require us to
vacate the sentences of death imposed by the jury and remand
the case to the circuit court for a new penalty-determination
proceeding.  As a result, issues raised by several of the
twelve questions presented are moot, as there is no
possibility that the specific errors assigned under those
questions presented will recur on remand.  <u>See</u> <u>Powell v.</u>
<u>Commonwealth</u>, 261 Va. 512, 531, 552 S.E.2d 344, 355 (2001).

---

[10] The assignments of error abandoned are numbers 1, 3, 4,
5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 19, 22, 33, 34, 36,
37, 38, 39, 40, 41, 43, 46, 52, 53, 55, 56, 57, 58, 59, 61,
62, 63, 64, 65, 66, 67, 68, 70, 71, 72, 73, 74, 81, 82, 83,
84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 98, 99,
100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111,
112, 114, 120, 122, 123, and 124.

Thus, we need not address the issue raised by question presented number two whether the Commonwealth failed to rebut the presumption of prejudice arising from juror Gahagan's extraneous contacts with her employer and co-worker during the recess in the penalty-determination phase of the trial; the issue raised by question presented number nine whether the circuit court erred in permitting the Commonwealth to present evidence of unadjudicated criminal conduct to be used during the penalty-determination phase of the trial to establish that Andrews presented a future danger to society for which notice had been given after the deadline set in the court's discovery order and denying Andrews' motion for a continuance on that ground;[11] and the issue raised by question presented number

---

[11] Within the notice of intent to use unadjudicated criminal conduct that Andrews contends was not timely, the Commonwealth referenced an incident in which Andrews attacked Crawford while the two were incarcerated together in the Prince William County Adult Detention Center. Andrews has assigned error separately to the introduction of testimony concerning this incident during the guilt-determination phase of the trial. Because, in addressing that issue, we conclude that the evidence was admissible to show Andrews' consciousness of guilt, and Andrews clearly would have known of this incident, any error arising from the inclusion of this incident within the alleged untimely notice of unadjudicated criminal conduct to be used during the penalty-determination phase of the trial would be harmless as to its use for a different, permissible purpose during the guilt-determination phase.

twelve whether Andrews was prejudiced by having a different judge, who had not presided over the trial, conduct the post-trial review of the jury's verdict and determining whether to impose or commute the jury's sentences of death.

IV. GUILT-DETERMINATION PHASE ISSUES

A. Striking for Cause of Juror Agnew

As stated in the opening brief, the assignment of error that Andrews addresses under his eleventh question presented is:

69. The trial court erred in striking Juror Agnew for cause.

During voir dire, the circuit court asked the potential jurors, "If you're selected to be on the jury and you find Mr. Andrews guilty beyond a reasonable doubt, can you pledge that you can consider the full range of penalties based upon the evidence and the law that is presented to you?" (Emphasis added.) One member of the venire, Pamela Agnew, responded, "I guess not." The court called Agnew to the bench and conferred with her along with counsel for Andrews and the Commonwealth.

Agnew explained she could not impose a sentence of death unless Andrews' guilt had been established "beyond the shadow of a doubt. I would have to be a hundred percent sure. I would have to be a hundred percent sure in order to [impose] the death penalty." The court explained that "the standard of

25

proof in a criminal case is not beyond a shadow of a doubt or beyond all doubt, it's beyond a reasonable doubt." In response to questions from the court and Andrews' counsel, Agnew stated that she could convict Andrews of capital murder if the evidence proved his guilt beyond a reasonable doubt, and that she would be able to "consider" the entire range of sentencing available for that crime.

In response to questions from the Commonwealth, however, Agnew again stated that to vote to impose the death penalty "I would need to be one hundred percent sure. . . . Could I consider it? Yes. Could I apply it? At the level of one hundred percent certainty." She further stated that she felt there was a difference between being able to consider voting to impose the death sentence and actually doing so, indicating that she had "agonized" over the issue since the venire had been called. While agreeing that the circuit court had "authority" in such cases, and though she did not believe that her moral and religious beliefs would impair her ability to serve on the jury, Agnew also indicated that her conscience would be guided by a "higher authority."

Andrews opposed the Commonwealth's motion to strike Agnew from the venire for cause, contending that she was qualified to serve on the jury because she could vote to convict based on evidence beyond a reasonable doubt and could consider imposing

26

the death sentence.  This was so, Andrews' counsel contended, because "[o]ne who votes for the death penalty can vote for the death penalty for whatever reason they want, [t]he question is can they consider it."  The circuit court granted the Commonwealth's motion to strike Agnew from the venire.

In asserting that the circuit court erred in striking Agnew from the venire, Andrews contends that while a juror must be able to follow the court's instruction to consider the question of guilt and innocence under the standard of beyond a reasonable doubt, and also apply that standard to the determination of aggravating factors, "Virginia law sets no [reasonable doubt] standard for the selection of the death penalty" by a juror.  Rather, Andrews contends that the law requires the juror to consider between a sentence of life or death, imposing the former if "the death penalty is not justified."  Andrews contends that Agnew's voir dire demonstrates that she would have been able to impose the death penalty under this standard.

The Commonwealth responds that Andrews fails to consider Agnew's responses to the voir dire in their entirety.  When taken in aggregate, the Commonwealth contends that her responses support the circuit court's exercise of discretion in striking Agnew from the venire for cause, as there was a reasonable probability that she would be unable to follow the

27

court's directions concerning the appropriate standard of law to be applied in considering the sentence to impose on Andrews if he were found guilty of capital murder.

As an appellate court, we give deference to a circuit court's ruling on the issue of whether to retain or excuse a prospective juror for cause and that ruling will not be disturbed on appeal unless there has been manifest error amounting to an abuse of discretion. Vinson v. Commonwealth, 258 Va. 459, 467, 522 S.E.2d 170, 176 (1999), cert. denied, 530 U.S. 1218 (2000). As with any matter submitted to the court's discretion based on representations made under examination in open court, it is the trial judge who sees and hears the prospective juror and, thus, is in the best position to weigh her "inflections, tone, and tenor of the dialogue, and [her] general demeanor." Smith v. Commonwealth, 219 Va. 455, 464-65, 248 S.E.2d 135, 141 (1978), cert. denied, 441 U.S. 967 (1979); accord LeVasseur v. Commonwealth, 225 Va. 564, 584, 304 S.E.2d 644, 655 (1983), cert. denied, 464 U.S. 1063 (1984).

The standard to be applied by the circuit court in determining whether to retain a member of the venire on the jury panel is whether her answers during voir dire examination indicate to the court something that "would prevent or substantially impair the performance of [her] duties as a juror in accordance with [the court's] instructions and [the juror's]

oath."  Adams v. Texas, 448 U.S. 38, 45 (1980); accord Turner

v. Commonwealth, 234 Va. 543, 549, 364 S.E.2d 483, 486, cert.

denied, 486 U.S. 1017 (1988).  When this Court reviews a

circuit court's ruling on the seating of a juror, we consider

the voir dire of that juror as a whole, and do not consider the

juror's isolated statements.  Juniper v. Commonwealth, 271 Va.

362, 401, 626 S.E.2d 383, 408, cert. denied, 549 U.S. 960

(2006).

Applying these standards, we cannot say that the circuit

court abused its discretion in sustaining the Commonwealth's

motion to strike Agnew from the venire for cause.  Agnew's voir

dire demonstrates that she would have required proof of

Andrews' guilt "beyond the shadow of a doubt. . . . [a]t a

level of one hundred percent certainty" before she would be

able to consider imposing a sentence of death.  In other words,

although Agnew stated that she would be able to consider the

full range of sentencing available for the crime of capital

murder, she was equally clear that she would not be able to

consider imposing a sentence of death unless convinced the

Commonwealth had already established Andrews' guilt in the

absence of all doubt.  Thus, in order for Agnew to actually

consider whether a sentence of death was "justified," she would

have required the Commonwealth to first satisfy a burden of

proof of guilt beyond what is required by the law and contrary to how the circuit court would have instructed her.

Moreover, Agnew told the circuit court that she had "agonized" over this point and conceded that, while recognizing the authority of the court, she also had to rely upon a "higher authority" in such matters. Agnew also told the court that she was "nervous" and had to stop to compose herself when answering questions. Thus, the court had not only her answers to consider, but her demeanor as well in judging whether she would be able to properly follow the court's instructions. For these reasons, we hold that the circuit court did not abuse its discretion in striking Agnew from the venire for cause.

### B. Unadjudicated Bad Act Evidence

As stated in the opening brief, the assignments of error that Andrews purports to address under his fourth question presented are:

> 2. The trial court erred in denying Andrews' Motion to Preclude Unadjudicated Criminal Acts.
>
> 35. The trial court erred in denying Andrews' Motion to Preclude Evidence of Unadjudicated Criminal Acts.
>
> 42. The trial court erred in allowing evidence at the guilt/innocence phase regarding a fight between Andrews and Jamel Crawford while they were in jail awaiting trial.

Andrews filed a motion in limine concerning evidence of prior unadjudicated criminal conduct. The motion, filed June 19,

30

2007, dealt primarily with the issue of whether the Commonwealth had provided adequate notice of its intent to use such evidence in the penalty-determination phase of the trial, but did not specifically address the conduct referred to in assignment of error number 42. Moreover, within the section of the opening brief addressing the fourth question presented, Andrews makes no reference to this motion or any argument relevant to the issues raised therein. Instead, the argument of this question presented is confined to the issue raised by assignment of error number 42. Accordingly, Andrews has waived any reliance on assignments of error number 2 and number 35 as a basis for reversing his convictions and death sentences, and we will limit our discussion of the fourth question presented to whether the circuit court erred in permitting Crawford to testify in the guilt-determination phase of the trial regarding his fight with Andrews while they were incarcerated together awaiting trial.

When Crawford testified during the guilt-determination phase of the trial, the Commonwealth asked him whether "there [had] been any problems . . . in the jail" between him and Andrews. Andrews' counsel objected to this line of questioning, asserting that it was not "relevant to any of the charges." The Commonwealth responded that Andrews had "attacked [Crawford] to try to keep him from testifying."

Andrews' counsel responded that the notice he had been given of this testimony was for use in the penalty-determination phase, with the circuit court agreeing that it had understood from the notice that evidence of "maladjustment in jail" was "going to be used as part of [the Commonwealth's] sentencing case."

The Commonwealth maintained that the purpose for introducing the evidence at this point in the trial was "a separate issue as to whether or not [Andrews] has taken actions to try to keep [the] witness from testifying." Andrews' counsel interposed that the evidence was "extremely prejudicial concerning the charges at this time," but raised no further objection at that point. The circuit court permitted the Commonwealth to proceed.

Crawford then testified that although he and Andrews were being held on different blocks in the jail, an incident took place when Andrews pushed past two corrections officers as Crawford was being taken by Andrews' block. According to Crawford, Andrews attacked Crawford, hitting him "many times" and threatening to kill him. Crawford required medical attention after the attack. Following this testimony, Andrews did not renew his motion to exclude the evidence or otherwise assert that the Commonwealth failed to show what Andrews' motive had been in attacking Crawford.

During a subsequent redirect examination of Crawford, the Commonwealth asked him whether Andrews "called him any names" during the attack, but Crawford responded that Andrews only "said he was going to kill me." On further cross-examination, Crawford denied that he had instigated the confrontation or been punished by jail authorities as a result.

On brief, Andrews now contends that the circuit court erred in admitting Crawford's testimony concerning the fight because it "was not probative of any element of the charged offenses, but was introduced merely to prove that Andrews has a propensity to commit violent acts." This is so, Andrews contends, because the Commonwealth "failed to establish that the testimony was probative of any 'consciousness of guilt' " in that nothing about the attack was overtly indicative of Andrews' supposed motive to keep Crawford from testifying. In the absence of such evidence, Andrews contends that "it is equally likely that the fight was motivated by the anger of an innocent man falsely accused, by resentment over perceived favorable treatment [of Crawford] in jail, or simply an impulsive act."

The Commonwealth responds that Andrews' objection at trial prior to Crawford's testimony about the fight was not sufficiently specific to preserve for appeal the argument made on brief that the testimony failed to adequately establish

that Andrews' motive for the attack was to prevent Crawford from testifying. The Commonwealth also contends that "evidence of a violent assault on a key witness" by a defendant is sufficient to raise the inference that the defendant intended to intimidate the witness or otherwise prevent him from testifying at trial, even if the defendant does not use words that expressly state his intent. We will consider the objection to relevance, and the subsequent reference to prejudice, asserted by Andrews prior to Crawford's testimony concerning the attack in the jail as sufficient to preserve the issue for appeal.

We agree with the Commonwealth that the evidence was admissible to show consciousness of guilt. "Evidence that a person charged with a crime procured, or attempted to procure, the absence of a witness, or to bribe or suppress testimony against him, is admissible, as it tends to show the unrighteousness of the defendant's cause and a consciousness of guilt." McMillan v. Commonwealth, 188 Va. 429, 432-33, 50 S.E.2d 428, 430 (1948); see also United States v. Young, 248 F.3d 260, 272 (4th Cir. 2001) ("[E]vidence of witness intimidation is admissible to prove consciousness of guilt if it is both related to the offense charged and reliable."). Although the admission of such evidence is a "close call" in many instances, the decision whether the defendant's actions

34

are sufficiently probative of his consciousness of guilt to overcome the prejudice inherent in admitting evidence of subsequent bad acts is committed to the sound discretion of the trial court, and the decision to allow evidence of this nature is reviewed under an abuse of discretion standard. United States v. Smith, 352 Fed. Appx. 387, 389-90 (11th Cir. 2009); see also United States v. Mendoza, 236 Fed. Appx. 371, 389 (10th Cir. 2007).

Accordingly, the issue before us is whether the circuit court abused its discretion in permitting the Commonwealth to elicit testimony from Crawford that Andrews assaulted and threatened to kill Crawford based on the inference that Andrews' motive was to silence or intimidate Crawford into altering his anticipated incriminating testimony. In this regard, we will address Andrews' contention that the Commonwealth was required to prove that this was his motive for attacking and threatening Crawford by direct, overt evidence. This is an issue of first impression in this Commonwealth.

When it is established that the defendant has procured a third-party to act on his behalf, the court will be able to judge by the nature of the communication between the defendant and the proxy whether the intention was to silence or intimidate the witness. See McMillan, 188 Va. at 433, 50

35

S.E.2d at 430. However, when, as here, it is the defendant who commits the act of aggression against the witness, rather than a third-party allegedly acting on the defendant's behalf, in the absence of direct evidence establishing an intent to intimidate the witness, the accepted rule is that the primary focus of the inquiry as to the defendant's intent is on the likely effect of the defendant's actions. This is to be determined by the trier of fact.

In Commonwealth v. Scanlon, 592 N.E.2d 1279 (Mass. 1992), for example, the defendant contended that evidence that he had deliberately driven his vehicle toward a group of pedestrians including the complaining witness and another witness expected to testify against him, only swerving away at the last moment, was inadmissible to show consciousness of guilt because there was no direct evidence that he had intended for this act to intimidate the witnesses. The Massachusetts Supreme Judicial Court rejected this contention, stating that there was "no such rule" requiring direct evidence of the intent underlying a threat or act of violence directed at a witness by a defendant. Id. at 1286-87. Rather, the Court held that the evidence was admissible to show consciousness of guilt and "[i]f conflicting inferences are to be drawn from a defendant's conduct, the determination of where the truth lies is the province of the jury." Id. at 1287.

36

Similarly, in State v. McGhee, 788 P.2d 603 (Wash. Ct. App. 1990), the Court of Appeals of Washington considered the question whether the defendant's threat against a witness "could have been [the action] of a wrongfully accused person," as he maintained, or "[m]ore plausibly [that] it was the conduct of one with guilty knowledge attempting to intimidate a witness." Id. at 605. The Court held that the evidence was admissible and that "the inference [to be drawn therefrom] was for the trier of fact." Id.

We are persuaded by the rationale of Scanlon and McGhee that when, as in this case, the threat or act of violence against a key witness is done by the defendant himself, the trier of fact may draw a reasonable inference that the defendant intends to silence or intimidate the witness. Therefore, a trial court does not abuse its discretion in permitting the Commonwealth to elicit such testimony. If, as Andrews maintains, there were alternative explanations for what may have motivated him to attack and threaten Crawford, it was for the jury to determine whether the Commonwealth's contention regarding Andrews' motive for the attack was the more plausible. Accordingly, we hold that circuit court did not abuse its discretion in permitting the Commonwealth to elicit testimony from Crawford during the guilt-determination

37

phase of the trial concerning the attack on him and the threat to kill him made by Andrews.

C. Hearsay Evidence Concerning the "Missing" Titan Pistol

As stated in the opening brief, the assignments of error that Andrews addresses under his sixth question presented are:

45. The trial court erred in admitting hearsay statements regarding an allegedly stolen gun.

77. The trial court erred in allowing testimony regarding an alleged report of a stolen gun, and an NCIC report concerning that gun.

During Detective Walker's testimony, the Commonwealth asked him about the standard procedure for dealing with a report of a stolen weapon. Walker indicated that the normal procedure would be to enter information concerning the weapon into the NCIC database. The Commonwealth then began to ask Walker about "the report that the police department received from [Andrews'] mother," but Andrews' counsel interposed an objection before the question could be completed.

In a bench conference, Andrews' counsel asserted that "the statements are not in evidence at all about what the mother said . . . it's hearsay." The Commonwealth asserted that the evidence of the report of the missing or stolen pistol was not hearsay because it was being offered not for its truth, but rather to explain why the police acted to enter the information into the NCIC database. In response, Andrews'

38

counsel contended that the evidence was "offered for the truth of what she[] sa[id]. . . .  Secondly, he enters a weapon into NCIC.  What's the relevance of that?"

The circuit court permitted the Commonwealth to continue its examination of Walker over Andrews' objection.  Walker confirmed that a report of a stolen or missing .25 caliber Titan automatic pistol had been entered into the NCIC database on January 9, 2002 as a result of the report received from Andrews' mother.  On cross-examination, Walker conceded that he personally had not received this report of the stolen weapon, but had "talked to the detective that spoke with the mother."  Andrews then renewed his motion to exclude the testimony as hearsay.  The circuit court again overruled the motion.

Andrews contends that the circuit court erred in permitting Walker to testify concerning the stolen or missing .25 caliber Titan automatic pistol.  He maintains that Walker had no direct knowledge concerning the weapon, but only based his testimony on the information entered into the NCIC database by an unidentified person following a report of another police officer who had received the information from Andrews' mother.  Thus, he contends that Walker's testimony was based upon a "chain of hearsay."

The Commonwealth responds that the circuit court did not err in permitting this testimony because it was not "offered for the truth of the matter asserted therein, i.e., that the information given actually was the serial number of the stolen gun." Rather, the Commonwealth contends that the purpose of the evidence was merely to explain the process of Walker's investigation of the crime.

We do not agree with the Commonwealth's assertion that the evidence produced by Walker's testimony concerning the information he obtained through the NCIC database was not being offered for its truth. Unlike Frye v. Commonwealth, 231 Va. 370, 387, 345 S.E.2d 267, 279-80 (1986), where we approved the admission of an NCIC report under the "business records exception" to the hearsay rule, the evidence here was not offered merely to show how the content of the NCIC database furthered the investigation of the crime. Rather, it is clear that this evidence was being offered, at least in part, to establish that Andrews had access to a .25 caliber Titan automatic pistol, the same make and caliber as the principal pistol used in the January 2, 2002 shootings. As such, we agree with Andrews that the circuit court erred in permitting the Commonwealth, under the guise of presenting the evidence to explain "police procedure," to introduce hearsay evidence from Walker's testimony concerning the report received by

another police officer from Andrews' mother and its subsequent use in creating the NCIC information by someone other than Walker.

Andrews asserts that the admission of this hearsay evidence violated his Sixth Amendment right of confrontation because the information Andrews' mother provided to police was "testimonial" in nature. Although Andrews offers no authority to support this assertion, we will assume without deciding that a report to police of a missing or stolen pistol received during the course of a criminal investigation is testimonial hearsay for Confrontation Clause purposes and that its admission at Andrews' trial was constitutional error. See, e.g., United States v. Henry, 226 Fed. Appx. 963, 965 (11th Cir. 2007).

When a federal constitutional error is involved a reversal is required unless we determine that the error is harmless beyond a reasonable doubt. Zektaw v. Commonwealth, 278 Va. 127, 139, 677 S.E.2d 49, 56 (2009). Accordingly, we must determine " 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " Chapman v. California, 386 U.S. 18, 23 (1967) (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963)). In making that determination, we consider, among other factors, "the importance of the tainted evidence in the prosecution's

41

case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case." Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999) (citing Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)).

Here, the evidence that Andrews had prior access to a pistol of the same make and caliber as one of the pistols used in the January 2, 2002 shootings in Head's apartment was not essential to proving Andrews' involvement in those crimes. By direct evidence from Berry, the Commonwealth had already established that Andrews had displayed a pistol in Head's apartment and that he used that pistol to shoot Berry. Forensic evidence further established that the pistol used to shoot Berry was also used to fire seven of the eight bullets that struck Head and Morrison, and further that, individually, the wounds caused by the pistol would have been fatal to both victims.

Given this evidence, the jury would not have had to determine whether the pistol Andrews used was the .25 caliber Titan automatic pistol reported stolen or missing or some other weapon of the same make and caliber, since that issue was not essential to the jury's determination of Andrews' culpability for the crimes committed on January 2, 2002.

Thus, the evidence that Andrews had access to a pistol of the same make and caliber as the pistol that the Commonwealth had already established by direct evidence Andrews possessed and used was merely cumulative. The jury would not have had to rely on that evidence in order to convict Andrews of the crimes committed on January 2, 2002.[12] Accordingly, we hold that the error in the admission of hearsay evidence concerning the .25 caliber Titan automatic pistol that Andrews' mother reported to the police as missing or stolen was harmless beyond a reasonable doubt.

## D. Ballistic Evidence Issues

As stated in the opening brief, the assignments of error that Andrews purports to address under his fifth question presented are:

7. The trial court erred in denying Mr. Andrews' Motion to Dismiss for Spoliation of Evidence.

54. The trial court erred in excluding Mr. Andrews' evidence that the alleged murder weapons had been destroyed.

---

[12] Arguably, the Commonwealth's purpose in presenting this evidence was to show that Andrews had access to the pistol before the January 2, 2002 crimes in order to establish that he could have used the weapon in the murder of Breeding. However, as Andrews was acquitted of that crime, any prejudice resulting from the error in the admission of the hearsay evidence with regard to that offense is moot.

78. The trial court erred in failing to provide the defense with a ballistics expert who could independently review the ballistics [evidence] in this case.

79. The trial court erred in giving the following instruction to the jury: "Due to no fault of the Commonwealth of Virginia or the Defendant or his counsel, the firearms were not available for inspection and analysis by the Defendant or the Commonwealth nor [were] the Defendant's experts able to conduct independent ballistics tests."

80. The trial court erred in permitting the prosecution to introduce unreliable and invalidated ballistics evidence.

Andrews presents no express argument of the issues asserted in assignments of error 54 and 78. Accordingly, with respect to the issue of whether Andrews was erroneously prohibited from presenting evidence of the destruction of the alleged murder weapons and whether the circuit court erred in failing to appoint a ballistics expert to assist Andrews in his defense, we hold that these issues have been waived.[13] Rule 5:17(c)(4); Rule 5:27.

_____

[13] On December 5, 2006, the circuit court granted Andrews' request for appointment of a ballistics expert to aid in his defense. The court limited the expert's function to "reviewing and analyzing the reports prepared by the Commonwealth's witnesses," but included the provision that "the scope of the ballistic[s] expert's appointment may be expanded with an additional showing of a more particularized need." This order was endorsed by Andrews' counsel as "asked for" and without objection or reservation. There is no indication in the record that Andrews ever sought to have the

With regard to assignment of error 7, although Andrews makes reference within the opening brief to his motion to dismiss for the alleged spoliation of evidence as a result of the destruction of the weapons by New York authorities, he makes no substantive argument that the circuit court erred in denying that motion. The Commonwealth contends that Andrews has waived his argument that the court erred in determining that the destruction of the weapons was not chargeable to the Commonwealth and, thus, not susceptible to a claim of spoliation requiring dismissal of the indictments against him. Teleguz, 273 Va. at 472, 643 S.E.2d at 718; Wolfe v. Commonwealth, 265 Va. 193, 206-07, 576 S.E.2d 471, 479, cert. denied, 540 U.S. 1019 (2003). We agree with the Commonwealth. Accordingly, we will limit our consideration to Andrews' arguments concerning Arntsen's testimony and the instruction given by the circuit court to the jury during that testimony.

In a motion filed February 23, 2007, Andrews sought to have the indictments against him dismissed, or in the alternative to "suppress[] all testimony regarding the spoiled evidence" because the destruction of the weapons recovered by

---

scope of the ballistics expert's appointment enlarged to include an independent review of the ballistic evidence.

New York authorities prevented Andrews from conducting tests on those weapons. In the absence of forensic testing of the weapons, Andrews contended that his Sixth Amendment right of confrontation would be impaired because he could not meaningfully cross-examine the Commonwealth's ballistics expert. On May 30, 2007, Andrews filed a written "summation" of his argument on this motion, in which he asserted that his inability to have access to the weapons recovered in New York also interfered with his ability to "cross-examine [the Commonwealth's expert concerning] any evidence recovered in Virginia."

In an opinion letter dated June 5, 2007, subsequently incorporated by reference in an order dated June 18, 2007, the circuit court overruled Andrews' motion, finding that the destruction of the weapons by New York authorities was not chargeable to the Commonwealth. Moreover, even if the actions of the New York authorities were attributable to the Commonwealth, the Court nonetheless found that Andrews had not satisfied the two part test of California v. Trombetta, 467 U.S. 479, 489 (1984), to show both that the potential exculpatory nature of the evidence was apparent to the government at the time the evidence was destroyed and that the defense had no other means of obtaining the exculpatory evidence. The court noted that Andrews' principal assertion

of the exculpatory nature of the evidence which could have been obtained from the destroyed weapons was that neither weapon matched the serial number or description of the .25 caliber Titan automatic pistol which Andrews' mother told police was missing from her home and that the police entered into the NCIC database.  The court concluded that there was ample evidence to support this assertion even without the ability to examine the weapons.

Despite having found that the destruction of the weapons was not chargeable to the Commonwealth and that in any case their destruction did not result in any prejudice to Andrews, the court opined that

> some corrective measure must be articulated to explain the unavailability of the firearms to the fact-finder.  As such, the destruction shall be dealt with by the [c]ourt in a forthright manner in the presence of the jury.  The jury shall be instructed that despite repeated protective measures implemented by the Commonwealth of Virginia, the New York authorities destroyed the alleged murder weapons in August of 2005.  The jury will also be informed that because of these actions of the New York authorities, the Defendant's experts were not able to conduct independent ballistics tests, but were given the ability to analyze the New York tests.

As indicated above, during direct examination, Arntsen conceded that he could not state positively that eight of the nine .25 caliber bullets recovered from Berry, Head, and Morrison, the eight .25 caliber shell casings recovered at

47

Head's apartment, and the unfired .25 caliber cartridge found at Andrews' mother's home were all connected to the same weapon. At best, Arntsen was able to state that the eight bullets had all been fired from a .25 caliber Titan automatic pistol, and that the casings and cartridge had been chambered and cycled through a .25 caliber Titan automatic pistol, "but I can't say conclusively that the two were one." Asked by the Commonwealth what would be required in order to make that determination, Arntsen replied, "The firearm."

The Commonwealth then asked for a bench conference, requesting that the circuit court "provide the instruction to the jury . . . that there is not a firearm to compare due to no fault of either the Commonwealth or the defense." After some discussion of the wording of the instruction, Andrews' counsel agreed to the language, but asked that the court not give the instruction until after Arntsen had been cross-examined. When the Court indicated that it would read the instruction immediately, counsel replied, "Your Honor, just note our exception." The court then instructed the jury that

> [d]ue to no fault of the Commonwealth of Virginia or the Defendant or his counsel, the firearms were not available for inspection and analysis by the Defendant or the Commonwealth nor was the Defendant's expert[]able to conduct independent ballistics tests.

48

In cross-examining Arntsen, Andrews' counsel asked numerous questions about the methodology Arntsen used to compare the bullets to one another and in comparing the casings and cartridge. However, at no point was an objection raised by the defense to the reliability of Arntsen's testimony on these matters.

In briefing this appeal with respect to assignment of error 80, Andrews contends that the circuit court erred in permitting Arntsen to testify concerning his analysis of the bullets, casings and cartridge "[i]n the absence of the actual weapon that allegedly created the tool marks on these items." He asserts that, in the absence of the ability to test the specific pistol from which the bullets and casings were allegedly fired, such evidence is "dubious" and "questionable." In support of this argument, Andrews makes general assertions about the reliability of toolmark evidence to make comparisons between items of ballistic evidence in the absence of an exemplar fired from that pistol. Thus, he contends that the evidence should have been excluded because it was scientifically unreliable.

In his pre-trial motion, Andrews did not expressly challenge the scientific reliability of ballistic comparison evidence as a general proposition. Rather, his objection was limited to his ability to adequately cross-examine the

Commonwealth's expert without the ability to conduct independent ballistic tests on the destroyed weapons. Accordingly, the argument Andrews has advanced on brief regarding the admission of Arntsen's testimony does not correspond to the arguments he advanced in his motion in limine to exclude evidence because of alleged spoliation, nor does it reflect any objection actually raised at the time of Arntsen's testimony. We will not consider this argument for the first time on appeal. Rule 5:25.

Accordingly, the only remaining issue to be addressed under Andrews' fifth question presented is whether the circuit court erred in giving the cautionary instruction concerning the inability of either party to inspect or conduct tests on "the firearms."[14] "The decision whether to give a cautionary instruction is a matter lying within the trial court's

---

[14] At trial, Andrews' objection was limited to the timing of when the instruction was given, and there is no express objection to the intent to give such an instruction as stated in the June 5, 2007 opinion letter. Nonetheless, we conclude that the issue was adequately preserved by Andrews' argument advanced in the motion in limine, that he was impaired in his ability to cross-examine the Commonwealth's expert about the forensic testing of ballistics evidence recovered in Virginia by his inability to test the weapons destroyed in New York and implicit in his argument that the ballistics evidence should thus be excluded entirely was the assertion that a cautionary instruction would not be sufficient.

discretion and will not be disturbed on appeal unless the record shows an abuse of discretion." <u>Goins v. Commonwealth</u>, 251 Va. 442, 465, 470 S.E.2d 114, 129, <u>cert. denied</u>, 519 U.S. 887 (1996).

It should be noted that, although there had been other testimony concerning the .25 caliber Titan automatic pistol missing or stolen from Andrews' mother's home, Arntsen's testimony was limited to his analysis of the bullets, casings and cartridge. Arntsen never referred directly to the missing weapon or the weapons seized and destroyed by New York authorities. Likewise Detective Walker, who testified immediately before Arntsen, did not refer directly to the existence of the destroyed weapons. Thus, while the circuit court's initial determination to give the instruction concerned the destruction of the weapons by New York authorities, this context would not have been present in the minds of the jurors when the instruction was read to them.

Rather, the context of the instruction was framed by the fact that it came immediately after Arntsen had testified that he was unable to positively connect the bullets recovered from the victims with the casings and cartridge because he did not have "the firearm" with which to make such a comparison. When viewed in this respect, the circuit court's instruction did no more than advise the jury that there were no firearms which

51

either the Commonwealth or the defense had been given the opportunity to test and compare with the other ballistics evidence, and that neither party was at fault for this circumstance. As such, the court was properly instructing the jury that it was to consider only the evidence before it, giving to that evidence such weight as it might, and that it should not speculate about the absence of other evidence. The instruction was neutral and appropriate to the circumstances. Accordingly, we hold that the court did not abuse its discretion in giving this instruction to the jury.

### E. "Triggerman" Instruction[15]

As stated in the opening brief, the assignments of error that Andrews purports to address under his third question presented are:

44. The trial court erred in limiting Andrews' cross-examination of Jamel Crawford.

49. The trial court erred in taking judicial notice and instructing the jury during Jamel Crawford's

---

[15] As we have noted before, "[t]he euphemism, 'triggerman,' is inadequate to describe the breadth of criminal responsibility subject to the death penalty in Virginia. Immediately and obviously, capital murder cases are not confined to murders completed by the instrumentality of a firearm. Recognizing this inadequacy, our capital murder cases routinely use the term 'immediate perpetrator' as the appropriate descriptive term." Muhammad v. Commonwealth, 269 Va. 451, 483, 619 S.E.2d 16, 34 (2005), cert. denied, 547 U.S. 1136 (2006).

testimony that "only the person who pulls the trigger during a first degree murder is eligible for the death penalty," which is an inaccurate statement of Virginia law.

50. The trial court erred in refusing to instruct the jury at the guilt/innocence phase that under section 18.2-18 of the Virginia Code, Andrews could not be convicted of capital murder if he was not a principal in the first degree.

51. The trial court erred in denying Andrews' request that the jury be instructed that it must find him to have been a principal in the first degree to convict him of capital murder under section 18.2-18.

60. The trial court erred in limiting Andrews' proposed evidence regarding the victims' drug dealing.

97. The court erred in finding that there was not a "modicum" of evidence to suggest that Jamel Crawford was the triggerman in this case, when Prince William County had indicted Crawford as the shooter.

Andrews presents no express argument of the issues asserted in assignments of error 44 and 60. Accordingly, we hold that Andrews has waived his arguments with respect to whether the circuit court erred in limiting Andrews' cross-examination of Crawford and in not permitting him to present evidence of the victims' alleged drug dealing. Rule 5:17(c)(4); Rule 5:27.

During opening statements, Andrews' counsel told the jury that Crawford had "cooperated with the Commonwealth and expects consideration for his testimony. At the very least, he's not going to face the death penalty." In cross-examining Crawford during the guilt-determination phase of the trial,

53

Andrews' counsel had Crawford confirm that his counsel had "worked out a deal with the prosecution that they won't seek the death penalty."

On redirect examination, the Commonwealth asked Crawford if he had "told anyone at any time anywhere that you intended for Joshua Andrews to shoot anyone on January 2nd of 2002?" After Crawford responded that he had not, in a bench conference the Commonwealth asked the circuit court "to take judicial notice that only the person who pulls the trigger during a first degree murder is eligible for the death penalty." Andrews' counsel objected to the relevance of this request. The Commonwealth asserted that it "removes the bias if he can't get death," and the court ruled "it's an attempt at rehabilitation which is appropriate under the law." Andrews' counsel asked the court to "note my exception" and thereafter the Commonwealth in open court reiterated that "only the person who pulls the trigger during a first degree murder is eligible for the death penalty," with the court stating that it would "take judicial notice of that."

Following the conclusion of the evidence in the guilt-determination phase, when the circuit court and counsel were discussing jury instructions, Andrews proffered his Instruction EE which sought to distinguish between the culpability for capital murder as a principal in the first

54

degree and as a principal in the second degree.  Specifically, the instruction stated that to convict Andrews of capital murder the jury must find that he was a principal in the first degree and that to do so, "the Commonwealth has [to] prove[] beyond a reasonable doubt that [Andrews] was an active and immediate participant in" the murders of Head and Morrison. The instruction further stated that "[a] principal in the second degree is an individual who did not with his own hand commit the act that constituted the crime" and that "a principal in the second degree cannot be convicted of capital murder."

The Commonwealth objected, asserting that "[t]here isn't any issue before this [c]ourt regarding principals in the first degree or principals in the second degree.  All the evidence is that Mr. Andrews [was] the shooter. . . . There is no indication that he was ever a principal in the second degree."  Andrews' counsel responded that Berry's testimony established that both Andrews and Crawford were in the apartment.  Moreover, counsel noted that Berry "heard somebody right outside, right before the first shot went off, after which he blacked out.  He's got no idea what happened afterward."  Noting that Crawford did not deny being in the apartment, Andrews' counsel contended that "no one knows specifically or can testify specifically as to what happened

55

after [Berry was shot], then there is evidence supporting [the contention that Andrews could have been a] principal in the second degree" in the murders of Head and Morrison.

Andrews' counsel also contended that the evidence showed that Andrews was armed with only one gun when he entered the apartment, while the ballistics evidence established that two guns had been used in the shootings. Since one of the bullets from the second gun was "a potential death shot," he contended that "[t]here's no definitive evidence that establishe[d who was the] principal in the first degree with regard to that shot." The Commonwealth responded that, despite the evidence of a second gun being used, the evidence showed that the "gun that shot Mr. Berry is the same gun that shot Mr. Morrison and shot Mr. Head. In order for this theory to be viable for the jury, there would have to be some evidence that somehow [Andrews] gave the gun to somebody else." The circuit court refused the instruction, indicating that to be entitled to the instruction, the defense's theory that Crawford could have been the sole principal actor in the murder of Head and/or Morrison "must be supported by some modicum of evidence and in this case the [c]ourt doesn't see it."

Later in the discussion of the proposed instructions, Andrews' counsel returned to the issue of whether the jury should be instructed on the distinction between first and

second degree principals.  Referring to the redirect examination of Crawford, counsel noted that the court had "upon request by the Commonwealth [given] an instruction to the jury about when and whom could be responsible – face[] the death penalty in a capital charge."  Contending that this "instruction" raised the issue of whether Crawford might have been a principal in the first degree, counsel asked the court to reconsider its ruling refusing Instruction EE.  The court, noting that it had not instructed the jury on this point and only had taken judicial notice of the rule, indicated that it had not done so "in the context of culpability of Mr. Andrews, but rather . . . to corroborate Mr. Crawford's testimony that he knew he wasn't facing the death penalty."  Andrews' counsel responded, "It may have . . . been intended . . . that way, but it could be interpreted another way and I think it highlights the importance of having . . . [I]nstruction [EE]."  The court again refused to give the instruction, reiterating that it found "no factual basis for providing that instruction to the jury."

Returning to the issue a final time on the next day of trial shortly before the jury was instructed, Andrews' counsel contended that the "judicial notice" that the Commonwealth had requested during the trial was in conflict with Code § 18.2-18, which requires that a principal in the second

degree to a capital murder is to be "indicted, tried, convicted and punished as though the offense were murder in the first degree."  Counsel contended that during the trial the Commonwealth had misrepresented the law because "[i]t's not just that [a principal in the second degree] can't face the death penalty; it's that they can't be convicted of capital murder."  Thus, counsel contended that Instruction EE should be given so that "the state of the law should be accurately reflected."  The circuit court, which again had noted that the judicial notice was taken in reference to the issue of Crawford's potential bias, not Andrews' culpability for the murders, ruled that "the motion for reconsideration of the prior ruling of the [c]ourt is denied."

During closing arguments in the guilt-determination phase, when addressing the contention that Crawford had received consideration for his testimony, the Commonwealth asserted that "we got the Judge to instruct you that only the triggerman in Virginia in a case such as this is eligible for the death penalty.  [Crawford] was not the triggerman.  He can't get the death penalty.  That was not given to him by us in consideration; that was bestowed upon him by the law of this Commonwealth."

Andrews contends in assignment of error 49 that the circuit court erred "in taking judicial notice and instructing

58

the jury during Jamel Crawford's testimony that 'only the person who pulls the trigger during a first degree murder is eligible for the death penalty,' " asserting that this was "an inaccurate statement of Virginia law."[16]  However, at the point during the trial where the Commonwealth asked the court to take judicial notice that Crawford would not be subject to the death penalty as a principal in the second degree, Andrews' counsel's sole objection was to the "relevance" of the Commonwealth's request, stating that the fact Crawford was not subject to the death penalty "doesn't remove the bias."

Although Andrews' counsel subsequently raised the issue of whether the Commonwealth's recitation of the law was accurate during the court's review of proposed Instruction EE, the court correctly indicated at that time that the judicial notice was taken in reference to whether Crawford would have a motive to fabricate his testimony in order to avoid the possibility of receiving the death penalty.  At no point did

---

[16] Within the argument of this assignment of error, as well as at several points during the trial, both parties have conflated the concept of "taking judicial notice" with "instructing the jury."  Because the distinction is not germane to our resolution of this issue, we will not express any view as to whether the circuit court's "taking judicial notice" of the law as stated by the Commonwealth, without more, was the functional equivalent of instructing the jury on that point of law.

Andrews' counsel request that the court withdraw the judicial notice it had taken or give a clarifying instruction to the jury with regard to the effect of the judicial notice of the law on Crawford's testimony. Rather, counsel asked the court to give Instruction EE, which specifically defined the law with regard to Andrews' culpability for the murders, not Crawford's. Accordingly, we hold that Andrews' assignment of error 49 is barred because he is raising a different argument on appeal than was asserted in the circuit court at the time of the ruling being challenged. Rule 5:25.

In three other assignments of error, Andrews further contends that the circuit court erred in failing to give Instruction EE, thus depriving the jury of the option to acquit Andrews of capital murder if it found from the evidence that he was not the immediate perpetrator responsible for the murder of Head or Morrison. Though Andrews raises this issue in assignments of error 50, 51, and 97, his argument on brief is essentially that he was entitled to have Instruction EE given to the jury because there was more than a scintilla of evidence to support his theory that Crawford or some other person could have shot Head and/or Morrison after Andrews shot Berry and Berry lost consciousness. He contends that the following evidence would support giving Instruction EE:

1. The forensic ballistics evidence that showed the victims had been shot by two different guns, while "both Crawford and Berry testified that Andrews had only one gun."

2. Crawford had a motive to kill Head, because Head and Crawford were rival drug dealers and had other interpersonal conflicts.

3. Based on much the same evidence as was presented in Andrews' trial, Crawford had been indicted for capital murder for the deaths of Head and Morrison, thus the grand jury must have found there was probable cause to believe that Crawford could have been the immediate perpetrator of those crimes, and the quantum of evidence required to establish probable cause before a grand jury far exceeds the "more than a scintilla" needed to obtain a jury instruction.

The Commonwealth contends that Andrews did not specifically advance these facts in support of Instruction EE in the circuit court and, thus, we should not consider them now. Rule 5:25. The Commonwealth's position is not well taken with regard to the ballistics evidence, which Andrews' counsel clearly relied upon when Instruction EE was first considered. However, we agree that Andrews' counsel did not expressly advance the evidence of Crawford's alleged motive for killing Head or his indictment for the capital murders of Head and Morrison in support of Instruction EE in the circuit court. Accordingly, we will limit our analysis of this issue to the facts and argument in support of Instruction EE actually presented at trial.

Andrews' contention that "both Crawford and Berry testified that Andrews had only one gun" is not supported by the record.  At best, the evidence showed that Andrews displayed only one pistol to Berry and Morrison when he first entered the apartment and that Berry did not see a second pistol before he was shot and lost consciousness.  Berry did not testify that Andrews had only one pistol and would have had no basis for doing so.

Likewise, Crawford was adamant in his testimony that Andrews had at least two pistols – the .25 caliber pistol that Andrews had displayed to Crawford in Tucker's apartment and the .22 caliber pistol that Crawford had given him there.  Although during cross-examination Andrews' counsel attempted to elicit from Crawford an admission that he had retrieved the .22 caliber pistol from Andrews and carried it into Head's apartment, Crawford consistently denied that he had done so and affirmatively testified that Andrews had both weapons at all times after they left Tucker's apartment.

While it is true that the ballistics evidence showed that two different .25 caliber pistols were used in the shootings, at best Crawford's testimony can be interpreted as establishing that Andrews was armed with at least two pistols. It certainly cannot support the contention that Andrews had only one pistol and does not preclude the possibility that,

unknown to Crawford, Andrews was already in possession of a second .25 caliber pistol when they left Tucker's apartment, or that Andrews came into possession of another .25 caliber pistol after entering Head's apartment.

Likewise, the evidence that a second .25 caliber weapon, identified by Arntsen as an "Astra," was used during the shootings does not support Andrews' contention that someone other than Andrews was the sole immediate perpetrator of the murder of Head, the only victim who was shot by a bullet from the Astra. The medical examiner's evidence showed that Head's death would have resulted independently from wounds inflicted by both the Astra and the Titan, the weapon that Andrews used to shoot Berry. Accordingly, Andrews' contention that he was entitled to have the court give Instruction EE to the jury is premised solely on his contention that because Berry lost consciousness before Head and Morrison were shot, it was theoretically possible that Crawford, or some other unknown perpetrator, could have taken the Titan from Andrews and fired all the shots that killed Head and/or Morrison, including the shot from the Astra.

In considering questions concerning jury instructions, we have observed that:

> It has been repeatedly held that an instruction should not be given when there is no evidence tending to prove the facts upon which the

> instruction is based, for the reason that the tendency of such instruction is to mislead the jury by withdrawing their attention from the legitimate points involved in the issue.  Juries are sufficiently prone to indulge in conjectures, without having possible facts not in evidence suggested for their consideration.  And before either party is entitled to an instruction there must be more than a scintilla of evidence introduced.

Wagner v. Fiery, 206 Va. 370, 373-74, 143 S.E.2d 876, 879 (1965) (citation and internal quotation marks omitted); see also Avent v. Commonwealth, 279 Va. 175, 202, 688 S.E.2d 244, 259 (2010); Porter, 276 Va. at 241, 661 S.E.2d at 434.

The case of Eaton v. Commonwealth, 240 Va. 236, 397 S.E.2d 385 (1990), cert. denied, 502 U.S. 824 (1991), is instructive on the question of when a defendant on trial for capital murder will be entitled to a principal in the second degree instruction based upon the theory that the evidence does not exclude the possibility that someone other than the defendant was the immediate perpetrator of the crime.  In Eaton, the defendant contended that there was sufficient evidence in the record to support his theory that he was only culpable as a principal in the second degree for the capital murder with which he had been charged.  Specifically, he maintained that the jury could surmise that rather than committing the murder, he only acted in a manner to distract the victim, thereby giving his accomplice the opportunity to

shoot the victim. Id. at 255-56, 397 S.E.2d at 397. We held that the trial court did not err in refusing to instruct the jury on the definition of a principal in the second degree and on the jury's duty to convict the defendant of a lesser offense if it had a reasonable doubt as to his immediate culpability on the capital murder charge, because there was no evidence to support the instruction. Id. at 256, 397 S.E.2d at 397. We reached this conclusion even though the record established that the accomplice had actually handled the murder weapon at some point and there was no direct evidence that Eaton fired the fatal shot killing the victim, but only that he had used the same weapon to shoot others both before and afterwards. Id. at 241-42, 397 S.E.2d at 388-89.

Even viewing the evidence in the light most favorable to Andrews, as we must when the issue is whether the circuit court erred in refusing an instruction proffered by the defendant, Porter, 276 Va. at 241, 661 S.E.2d at 434, as in Eaton, we can find no evidence in the record which would take Andrews' theory that some other person might have been the sole immediate perpetrator of either or both murders out of the realm of pure conjecture. Andrews cannot, for example, rely on Berry's subsequent statement to the 911 operator that he and the others had been shot by "[a] couple of black males" to support the contention that a second perpetrator was

involved in the shootings, because as Andrews' own theory makes plain, Berry lost consciousness after the first shot was fired. Thus, Berry's statement, like Andrews' theory, is one of conjecture, not fact.

Similarly, the evidence that a second weapon was used to shoot Head does not provide the necessary evidence to show that his death was solely the result of actions taken by someone other than Andrews. Even accepting that the evidence that two weapons were used in the crime is a strong indication that there were at least two perpetrators, the evidence also establishes that Head's death would have resulted individually from wounds inflicted by either weapon.

"That there may be more than one principal in the first degree for a particular offense is beyond dispute." Muhammad v. Commonwealth, 269 Va. 451, 482, 619 S.E.2d 16, 33 (2005), cert. denied, 547 U.S. 1136 (2006); see also Coppola v. Commonwealth, 220 Va. 243, 257, 257 S.E.2d 797, 806-07 (1979), cert. denied, 444 U.S. 1103 (1980). Thus, evidence that a second weapon was used in the shooting of Head is not sufficient, in light of all the evidence, to establish that someone other than Andrews was the sole immediate perpetrator in the murder of Head.

As in Eaton, the absence of direct evidence that Andrews fired the shots that killed Head and Morrison is not evidence

66

that Crawford or some other person did so; it is merely a circumstance that permits the mere conjecture that this might have been the case. Moreover, unlike in Eaton, where the evidence established that the accomplice had actually handled the murder weapon at some point, there is no evidence that Crawford ever had a .25 caliber Titan automatic pistol in his possession, let alone that he took possession of the gun used to shoot Berry from Andrews in the brief space of time between the shooting of Berry and the murders of Head and Morrison. Accordingly, we hold that the circuit court did not err in refusing to give Instruction EE.

Based upon the foregoing analysis, we conclude that Andrews has not demonstrated that there was any reversible error in the conduct of the guilt-determination phase of his trial. Accordingly, we will affirm his convictions for capital murder.

V. PENALTY-DETERMINATION PHASE ISSUES

A. Convictions Under Code §§ 18.2-31(7) and 18.2-31(8)

As stated in the opening brief, the sole assignment of error that Andrews addresses under his first question presented is:

17. The trial court erred in overruling Andrews' objection to the imposition of four death sentences.

67

As indicated in the question presented, "Andrews' objection to the imposition of four death sentences" was that two of the death sentences were being imposed for identical conduct charged under separate subsections of Code § 18.2-31 in violation of the double jeopardy prohibition of multiple punishments. Specifically, Andrews contends that he cannot be convicted and punished under both Code §§ 18.2-31(7) and -31(8) because both offenses were proven based upon the concurrent murders of Head and Morrison.

The Fifth Amendment guarantee against double jeopardy, enforceable against the states through the Fourteenth Amendment, consists of three separate constitutional protections. North Carolina v. Pearce, 395 U.S. 711, 717 (1969). "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." Id. (footnotes omitted). The present case involves the third protection because Andrews' convictions, and the death sentences that resulted, occurred in a single trial. Blythe v. Commonwealth, 222 Va. 722, 725, 284 S.E.2d 796, 797-98 (1981). "In the single-trial setting, 'the role of the constitutional guarantee is limited to assuring that the court does not exceed its legislative authorization by imposing

68

multiple punishments for the same offense.' " Id. at 725, 284 S.E.2d at 798 (quoting Brown v. Ohio, 432 U.S. 161, 165 (1977)).

" '[T]he question whether punishments imposed by a court after a defendant's conviction upon criminal charges are unconstitutionally multiple cannot be resolved without determining what punishments the Legislative Branch has authorized.' " Albernaz v. United States, 450 U.S. 333, 344 (1981) (quoting Whalen v. United States, 445 U.S. 684, 688 (1980)). The issue is whether "[t]he General Assembly has clearly indicated its intent to impose multiple punishments" for the defendant's conduct. Turner v. Commonwealth, 221 Va. 513, 530, 273 S.E.2d 36, 47 (1980), cert. denied, 451 U.S. 1011 (1981).

In some cases, the legislative intent to impose multiple punishments is unambiguous because the statute in question makes that intent clear. Thus, in Turner we distinguished Busic v. United States, 446 U.S. 398 (1980), and concluded that the General Assembly intended to punish both capital murder during the commission of robbery while armed with a deadly weapon under Code § 18.2-31(4) and the use of a firearm in the commission of a felony under Code § 18.2-53.1, because the latter statute expressly provided that the offense it defined "shall constitute a separate and distinct felony" from

69

the predicate offense.  <u>Turner</u>, 221 Va. at 530, 273 S.E.2d at 47.

Even where the Code does not expressly provide for separately defined crimes to be subject to individual punishments, we may nonetheless conclude that crimes with common elements are subject to multiple punishments if the overall context in which those statutes were enacted clearly shows such legislative intent.  Thus, in <u>Fitzgerald v. Commonwealth</u>, 223 Va. 615, 292 S.E.2d 798 (1982), <u>cert. denied</u>, 459 U.S. 1228 (1983), we concluded that the forms of capital murder which required proof of another felony as a predicate gradation offense did not bar the Commonwealth from seeking to punish both the murder and the predicate offense. We reviewed the capital murder statutory scheme and its legislative history and concluded that the "overriding purpose" of the various homicide statutes is gradation.  We explained that "[t]he General Assembly grades murder in order to assign punishment consistent with prevailing societal and legal views of what is appropriate and procedurally fair." <u>Id.</u> at 636, 292 S.E.2d at 810.  Because of this overriding purpose, we concluded that there was "no legislative intent to eliminate punishment for other offenses included in the [capital] murder statute[] solely for the purpose of categorizing the murder" as one subject to the possible

imposition of the death penalty.  Id.  Accordingly, we held

that in enacting the separate subsections of Code § 18.2-31

that included predicate felonies such as rape, abduction, or

robbery, the General Assembly did not intend "any elimination

of underlying sentencing authority" to punish those predicate

gradation offenses along with the offense of capital murder.

Id. at 636-37, 292 S.E.2d at 810.

In Payne v. Commonwealth, 257 Va. 216, 509 S.E.2d 293

(1999), we concluded that a defendant could be subject to more

than one death sentence for the killing of one person if he

was charged under separate subsections of Code § 18.2-31 and

the evidence established that in committing the murder he had

committed the separate predicate gradation offenses of those

subsections.  Id. at 227-28, 509 S.E.2d at 300-01 (holding

that double jeopardy did not bar imposition of two death

sentences for the capital murder of the victim during the

commission of robbery, Code § 18.2-31(4), and the commission

of rape, Code § 18.2-31(5)).  We further concluded in Payne

that the General Assembly also intended to authorize multiple

punishments for the same murder charged under two counts of

the same subsection of Code § 18.2-31 if the evidence

established that in the commission of the offense the accused

committed two separate and distinct gradation offenses defined

in the subsection.  Id. at 228, 509 S.E.2d at 301 (holding

71

that commission of attempted rape and object sexual penetration of the victim, both gradation offenses of Code § 18.2-31(5), permitted the imposition of a death sentence for each offense).

In Burlile v. Commonwealth, 261 Va. 501, 509-10, 544 S.E.2d 360, 364-65 (2001), we further explained that in defining the nature of an offense that would elevate first degree murder to capital murder, the General Assembly has focused on several different types of gradation criteria. In Fitzgerald and Payne, the gradation criterion was the concurrent commission of another felony. In Burlile, we noted that other capital murder offenses were defined by gradation criteria involving "the status of the defendant" or the "status of the victim." Id. at 509, 544 S.E.2d at 364. see also Gray v. Commonwealth, 274 Va. 290, 309, 645 S.E.2d 448, 460 (2007). The foregoing cases demonstrate that there is nothing inherently offensive to principles of double jeopardy when a defendant is charged with multiple counts of capital murder, as well as other felonies, arising out of one set of operative facts.

The gradation criterion of Code § 18.2-31(7) is proof of a predicate felony, the commission of a murder in the same act or transaction in which another, or several other, murders occur. The gradation criterion of Code § 18.2-31(8) likewise

72

requires proof of the commission of at least two murders within a three-year period, each of which would constitute a predicate felony.  It is obvious, however, that in many instances the same operative facts would be sufficient to prove either offense.  In this sense, both offenses can be viewed as having gradation criteria defining the status of the defendant as having committed multiple homicides.

Although we have previously considered at least four prior appeals in which a defendant was convicted under indictments charging him with violations of Code §§ 18.2-31(7) and -31(8), we have not had occasion to address whether convictions under both subsections based on the same operative facts would violate the double jeopardy prohibition against multiple punishments.  In Burlile, for example, although the defendant had been convicted of violations of Code §§ 18.2-31(7) and -31(8), he limited his appeal to whether proof of his guilt under Code § 18.2-31(8) required proof that he was the immediate perpetrator of every murder included in the indictment for that offense.[17]  Burlile, 261 Va. at 506, 544

---

[17] In addition to Burlile, Gray and Zirkle v. Commonwealth, 262 Va. 631, 553 S.E.2d 520 (2001), also involved circumstances in which the constituent crimes supporting the indictments for each offense were the same and occurred as part of the same act or transaction.  As in

S.E.2d at 362. Thus, this case presents an issue of first impression as to whether the General Assembly intended through its enactment of Code § 18.2-31(8) to permit the punishment of the commission of two or more murders that occur within a three-year period as a separate offense when all of the constituent crimes for that offense also occur as part of the same act or transaction and the defendant is also convicted and punished for capital murder under Code § 18.2-31(7) in the same trial.

Andrews concedes that at the time of his indictment for these offenses, there was no potential double jeopardy issue because the indictment charging him with violation of Code § 18.2-31(8) included the murder of Breeding as one of the constituent murders occurring within a three-year period, and that offense was not a constituent murder under the indictment charging Andrews with violation of Code § 18.2-31(7).

---

Burlile, in neither case did the defense choose to assert a claim based on multiple punishment double jeopardy in challenging the death sentences and, thus, the issue was not before us. In Commonwealth v. Smith, 263 Va. 13, 557 S.E.2d 223 (2002), one of the constituent crimes upon which the Code § 18.2-31(8) conviction was founded was separate from and unrelated to the two murders that supported the conviction under Code § 18.2-31(7). Multiple punishment double jeopardy was thus not an issue in Smith, as it would not have been in this case had Andrews been convicted of Breeding's murder.

74

However, once he had been acquitted of Breeding's murder, Andrews contends that the jury's decision to convict under the indictment for violation of Code § 18.2-31(8) necessarily must have been premised only on the murders of Head and Morrison and, thus, was based upon the same evidence used to sustain his conviction under Code § 18.2-31(7). In this context, he contends that he has been subjected to impermissible multiple punishments for two offenses based upon the same operative facts.

Asserting that claims of double jeopardy are resolved based on an abstract analysis of the applicable statutes, rather than the specific facts of the individual case, Coleman v. Commonwealth, 261 Va. 196, 200, 539 S.E.2d 732, 734 (2001), the Commonwealth responds that multiple death sentences for convictions under Code §§ 18.2-31(7) and -31(8) do not offend the double jeopardy prohibition against multiple punishments. This is so, the Commonwealth asserts, because each offense requires proof of a fact that the other does not under the test prescribed for analyzing such cases by Blockburger v. United States, 284 U.S. 299, 304 (1932); see also Payne, 257 Va. at 228, 509 S.E.2d at 300. Specifically, the Commonwealth notes that under Code § 18.2-31(7) it was required to prove that Andrews committed multiple murders as part of the same act or transaction, while under Code § 18.2-31(8) it was

required to prove only that he committed two or more murders within a three-year period.

Andrews contends, however, that even when viewed in the abstract, a conviction under Code § 18.2-31(8) does not require proof of any fact that is not also required to prove a violation of Code § 18.2-31(7) when the predicate murders for that offense occur, as in this case, as part of a continuous act in immediate succession.  This is so, he contends, because it is "impossible for two killings to be so closely related in time as to satisfy the 'same act or transaction' requirement without occurring within three years of one another."

In all our prior cases interpreting the capital murder statute in which we have been required to consider whether the General Assembly intended for a defendant to be subject to multiple punishments in the same trial for conduct that met the criteria for more than one offense, we have either been confronted with circumstances, such as in Turner, where the legislature gave clear and unambiguous guidance on the issue through the language of one of the statutes at issue, or instances where the proscribed conduct as defined clearly required proof of different elements as in Fitzgerald, holding that rape and robbery and a murder committed in the commission of those crimes could all be punished separately, and Payne, holding that murder of one person that occurred in the

76

commission of multiple distinct and separate predicate gradation felonies could result in multiple punishments. But we have not heretofore addressed a circumstance, as in this case, where the General Assembly has defined two gradation criteria for elevating first degree murder to capital murder which can each be satisfied by proof that also would be sufficient to sustain the other. To resolve this question, we look to the current capital murder statutory scheme and its legislative history to determine whether the General Assembly intended for multiple punishments to be available in this circumstance. Fitzgerald, 223 Va. at 635-37, 292 S.E.2d at 810; see also Woodfin v. Commonwealth, 236 Va. 89, 96-97, 372 S.E.2d 377, 381-82 (1988), cert. denied, 490 U.S. 1009 (1989).

While the Commonwealth is correct that under Blockburger the analysis of whether multiple punishments are authorized by legislative act is to be conducted in the abstract, rather than by reference to the specific facts of the case under review, that analysis does not take place in a vacuum, and it does not follow that our analysis begins with the test set out in that case. Rather, before applying the Blockburger test, we first consider whether "the legislative intent is clear from the face of the statute or the legislative history," and if so, then "the Blockburger rule is not controlling." Garrett v. United States, 471 U.S. 773, 779 (1985); see also

77

Brown v. Commonwealth, 230 Va. 310, 313, 337 S.E.2d 711, 713 (1985) (holding that "the Blockburger test . . . need not be applied when the intent of the legislature can be gleaned from a reading of the relevant statutes").  Thus, while Blockburger can provide an efficient mechanism to parse statutory language in order to determine the legislature's intent with regard to whether multiple punishments are permitted for conduct chargeable under more than one code section, it is not the sole, or in many cases, the primary tool of statutory construction used to determine that intent.  As the United States Supreme Court has observed, "it would be difficult to contend otherwise without converting what is essentially a factual inquiry as to legislative intent into a conclusive presumption of law" that any differentiation in the language defining the elements of an offense would authorize multiple punishments for otherwise undifferentiated conduct.  Garrett, 471 U.S. at 779   In short, "[w]here the same conduct violates two statutory provisions, the first step in the double jeopardy analysis is to determine whether the legislature . . . intended that each violation be a separate offense."  Id.; accord Brown, 230 Va. at 313, 337 S.E.2d at 713.

78

Code § 18.2-31(7) was first enacted as Code § 18.2-31(g) in 1981.[18]   1981 Acts ch. 607.   Code § 18.2-31(8) was added to the capital murder statute in 1996.   1996 Acts ch. 959.   In the interim, we had determined that the offense defined by Code § 18.2-31(7) required the Commonwealth to "allege more than one killing in a single-count indictment" in order "to supply the numerical ingredient necessary to charge capital murder."   Morris v. Commonwealth, 228 Va. 206, 210, 321 S.E.2d 633, 635 (1984).   However, we also held in Morris that "[i]t d[id] not follow . . . that such an indictment will support multiple convictions or sentences."   Id.

In Woodfin, we also parsed the language of Code § 18.2-31(7), holding that "the phrase 'same act or transaction' . . . is synonymous with 'same criminal episode.'   In other words, two offenses arise out of the 'same act or transaction' if they are connected so closely 'in time, place and circumstance that a complete account of one charge cannot be related without relating details of the other charge.' "   Woodfin, 236 Va. at 92, 372 S.E.2d at 379 (quoting State v. Boyd, 533 P.2d 795, 799 (Ore. 1975) and State v. Fitzgerald,

_____

[18] To avoid confusion, we will hereinafter refer to Code § 18.2-31(7) by its current designation.

79

516 P.2d 1280, 1284 (Ore. 1973)) (internal citation omitted).

We concluded that where the "two murders were committed at the same location, about the same time, and under the same circumstances" the statute was not unconstitutionally vague because the "defendant reasonably should have been on notice that the statute applied to his actions." Id. at 92-93, 327 S.E.2d at 379.

In Buchanan v. Commonwealth, 238 Va. 389, 384 S.E.2d 757 (1989), cert. denied, 493 U.S. 1063 (1990), we further examined the scope of Code § 18.2-31(7). Our discussion of the statute's application with regard to the distinction between what the Commonwealth may charge by way of multiple indictments for capital murder, and whether it also may obtain multiple punishments in the trial on those indictments, is particularly instructive:

> [Code § 18.2-31(7)] describe[s] capital murder as the "willful, deliberate, premeditated killing of more than one person as a part of the same act or transaction." This means that it took the killing of at least two people as part of the same act or transaction to constitute one capital murder under [Code § 18.2-31(7)]. Here, four people were killed; thus, there was the theoretical possibility that Buchanan could be convicted of two capital murders. The critical issue is how many acts or transactions were involved. If all four individuals were killed in one act or transaction, Buchanan could only be convicted of one capital murder. If two individuals were killed as part of one act or transaction and the two others were killed as part of a second, different act or transaction, then Buchanan could be convicted of two capital murders.

80

But the theoretical limitation on the number of possible capital murder convictions that can be supported by four murders does not control the way in which the Commonwealth can frame indictments. The Commonwealth is free to indict an individual for as many separate crimes as the Commonwealth, in good faith, thinks it can prove.  Further, the Commonwealth is free to charge the commission of a single offense in several different ways in order to meet the contingencies of proof.  See Bryant v. Commonwealth, 189 Va. 310, 315, 53 S.E.2d 54, 56 (1949); R. Bacigal, Virginia Criminal Procedure § 13-6 (1983).  The indictments of which Buchanan complains were proper.  The Commonwealth was not required to make an election.

Id. at 397, 384 S.E.2d at 762.

We went on to conclude that while Buchanan would have been subject to at most two death sentences for capital murder in violation of Code 18.2-31(7), "if he had been so convicted, there could not have been any overlap in the two pairs of murder victims on which the convictions were based" in order for the Commonwealth to have sought and obtained separate punishments for the two convictions.  Id. at 398, 384 S.E.2d at 763.  We also concluded that Buchanan's conviction and death sentence for the capital murder of the predicate victim in the same act or transaction as the other three murders barred a separate conviction and sentence for the first degree murder of that victim as an impermissible multiple punishment in violation of double jeopardy.  Accordingly, we vacated the

81

life sentence imposed for the latter offense.  Id. at 415, 384 S.E.2d at 772-73.

"In ascertaining legislative intent, we presume that the General Assembly, when enacting new laws, is fully aware of the state of existing law relating to the same general subject matter."  Gillespie v. Commonwealth, 272 Va. 753, 758, 636 S.E.2d 430, 432 (2006) (citations omitted).  In Gillespie, we further indicated that when amending the existing capital murder statutes "[t]he General Assembly is not only presumed to have been aware of the capital murder statutes . . . but is also presumed to have been aware of our decisions construing them."  Id. at 759, 636 S.E.2d at 432.

Thus, in 1996 when the General Assembly enacted Code § 18.2-31(8), it was aware from Woodfin that we had interpreted Code § 18.2-31(7) as permitting the Commonwealth to punish as capital murder the killing of two or more persons where the murders "are connected so closely 'in time, place and circumstance that a complete account of one charge cannot be related without relating details of the other charge.' " 236 Va. at 92, 372 S.E.2d at 379.  Likewise, it was aware from Morris that the indictment for that offense required the inclusion of two or more murders "to supply the numerical ingredient necessary to charge capital murder."  228 Va. at 210, 321 S.E.2d at 635.  Finally, and most significantly,

82

Buchanan would have informed the General Assembly that, while the Commonwealth was free to put forth in separate indictments as many different theories of the crime that "in good faith, [it] thinks it can prove" and "to charge the commission of a single offense in several different ways in order to meet the contingencies of proof," 238 Va. at 397, 384 S.E.2d at 762, once the evidence had established the particulars of the crime, the Commonwealth could seek to obtain only one punishment under Code § 18.2-31(7) for all of the deaths that were part of "the same act or transaction."

Given this state of the law at the time Code § 18.2-31(8) was enacted, we hold that the General Assembly could not have intended to create a separate offense of capital murder under which a defendant could be punished for the same conduct for which he also could be punished under Code § 18.2-31(7). To accept the Commonwealth's position that an abstract application of the Blockburger test requires us to find that the legislature intended to allow for two punishments for the same conduct, we would in effect be required to read Code § 18.2-31(8) as defining as capital murder the killing of more than one person within a three-year period without regard to whether such killings occur as part of the same act or transaction. We do not believe that such a reading of the statute would be consistent with our application of Code

83

§ 18.2-31(7) permitting only one punishment thereunder for all murders that are part of one act or transaction, nor are we permitted to imply a meaning not found on the face of the statute by adding words not used by the General Assembly to obtain that result.  See Burlile, 261 Va. at 511, 544 S.E.2d at 365.

In summary, we conclude that the Commonwealth is free to indict the defendant under Code § 18.2-31(8) for the murder of more than one person within a three-year period when each of the constituent murders occurred as part of the same act or transaction, and also indict the defendant for capital murder under Code § 18.2-31(7) for the same murders.  However, if the Commonwealth obtains convictions on both indictments it may not seek to have separate punishments imposed for each offense.  Rather it must elect which indictment it will proceed upon in the penalty-determination phase of the trial.[19] For these reasons, we hold that the imposition of two death

---

[19] Nothing in this opinion should be construed as barring the Commonwealth from seeking to convict and punish a defendant for capital murder under both Code §§ 18.2-31(7) and –31(8) where, as in Smith, the evidence proves that one or more of the constituent killings that form the basis of the latter offense occurred as part of a separate act or transaction from the constituent killings that support the indictment under the former.

sentences upon Andrews for the convictions under Code §§ 18.2-31(7) and -31(8) violated the double jeopardy prohibition against multiple punishments for the same offense.

Andrews asserts that "[u]nder these conditions, the remedy is to set aside one of the capital murder convictions." In a typical case where a defendant has been subject to impermissible multiple punishments, "the only remedy consistent with [the legislature's] intent is for the [trial court], where the sentencing responsibility resides, to exercise its discretion to vacate one of the underlying convictions."  Ball v. United States, 470 U.S. 856, 864 (1985).  In the present case, however, because of other errors in the penalty-determination phase of Andrews' trial that require that all four death sentences be vacated, the appropriate remedy is to direct that upon remand the circuit court shall require the Commonwealth to elect between the convictions under Code §§ 18.2-31(7) and –31(8), proceeding on only one in the new penalty determination proceeding.  The circuit court thereafter shall vacate the other conviction.

### B. Victim Impact Evidence

As stated in the opening brief, the assignments of error that Andrews purports to address under his seventh question presented are:

18. The trial court erred in denying Andrews' Motion for New Trial.

23. The trial court erred in allowing victim impact testimony at the guilt/innocence phase regarding an extraneous and unrelated shooting.

24. The trial court erred in allowing victim impact testimony at the penalty stage of trial regarding an extraneous and unrelated shooting.

25. The trial court erred in allowing Sheila Kennedy to testify.

31. The court erred in denying Andrews' Second Motion for New Trial.

32. The trial court erred in not ordering a new trial based upon the cumulative prejudice that was created by the legal errors in this case.

75. The trial court erred in allowing Rutherford Berry to testify that after the shootings he left the Washington area for safety reasons.

76. The trial court erred in permitting testimony at the guilt/innocence phase regarding the impact of the alleged offenses upon the victim(s).

Andrews contends that the circuit court erred in permitting the victim impact testimony of four witnesses — Rutherford Berry, Miram Benson, Dinesh Jasani, and Sheila Kennedy. Because Andrews raised no objection to the alleged victim impact testimony of Berry or any other witness during the guilt-determination phase, assignments of error 23, 75, and 76 were not preserved for appeal. Rule 5:25. Andrews also presented no argument during the penalty-determination phase regarding the alleged victim impact testimony of Benson

and Jasani.  Accordingly, we will not address Andrews' arguments as to these two witnesses.  Id.  Furthermore, Andrews presents no express argument on brief of the issues asserted in assignments of error 31 and 32.  Thus, these assignments of error have been abandoned.  Rule 5:17(c)(4); Rule 5:27.  Finally, because Andrews did not argue at trial that Sheila Kennedy's testimony violated his constitutional rights, we will limit our analysis of assignments of error 18, 24, and 25 to whether Sheila Kennedy's victim impact testimony violated Virginia law.

Two days after the murders of Head and Morrison, Andrews allegedly committed a robbery and shooting at a Stafford County convenience store.  The particulars of those events were subsequently recounted at Andrews' trial.  Jasani, the owner of the store, testified that he and Gary Kennedy were working behind the counter when Andrews entered the store, announced his intent to commit robbery, and shot Kennedy in the head.  Tiffany Lashea Hawthorn-Dorsey, a patron of the store during the robbery, also testified that Andrews shot Kennedy.  Kennedy, who survived the shooting, did not testify.  According to Stafford County Circuit Court records, the charges against Andrews arising from the robbery and attempted capital murder of Kennedy were dismissed on the Commonwealth's motion for nolle prosequi on February 28, 2006.

Before Sheila Kennedy, Gary Kennedy's daughter, testified, Andrews' counsel asked for a proffer of her testimony.  The Commonwealth responded, "Victim's impact, the effect the shooting has had on Mr. Kennedy, the effect it's had on her family."  Andrews' counsel then objected to Kennedy's testimony on the basis that she was not a statutory victim of the offense for which Andrews was on trial.  The circuit court overruled the objection.

When asked about the impact of the shooting on her father, Kennedy testified:

> He's got a permanent speech problem.  His equilibrium is off. . . .  He's lost a lot of weight.  He's on Cumadin for the rest of his life because he has a blood clot in his left leg, and he has a filter.  He'll never, ever be able to work with heating and air conditioning ever again.  It's been a big impact on him.

She later added, "he doesn't have feeling in his right arm or his hand, so he can't hold my children unless he's sitting down" and "he can't walk a long distance without getting out of breath.  He can't walk up hills and stuff.  He just usually stays at home, and I don't think he has the motivation [to work] anymore."  Kennedy also testified about the effect the shooting had on her:

> Every time I look at him it hurts me . . . because he doesn't smile like he used to smile.  He could tell you a joke and smile . . . and now he just – he tries. . . .  My dad was my everything.

88

Following Kennedy's testimony, Andrews' counsel argued that Gary Kennedy was not a victim of the charged crimes and that there was no statutory provision to allow victim impact testimony related to an unadjudicated criminal act. The circuit court responded, "I've already ruled on that. Let's move on." Prior to closing arguments, Andrews' counsel renewed the objection, asking the court to preclude the Commonwealth from referring to Kennedy's testimony on the basis that "she was not a statutory victim with regard to these charges." The court again overruled the objection.

On appeal, Andrews contends that by testifying to the impact of crimes other than the capital crimes for which Andrews was being sentenced, Kennedy's testimony went beyond the scope of victim impact testimony allowed by Code § 19.2-264.4. According to Andrews, the plain language of Code § 19.2-264.4 limits victim impact testimony to "the impact of the offense upon the victim," meaning the capital murder offense for which the defendant is on trial. (Emphasis added.)

The Commonwealth does not expressly respond to these assertions. Instead, the Commonwealth asserts that Andrews waived the victim impact issue because he did not object at trial that Kennedy's testimony was improper victim impact testimony. The Commonwealth maintains that even if Andrews

had objected he cannot show prejudice from Kennedy's testimony which in lieu of live testimony from Gary Kennedy was sanitized to avoid provoking an unduly emotional response from the jury.

As an initial matter, we find that Andrews properly preserved the issue of whether Sheila Kennedy's testimony would be proper victim impact evidence in a capital murder trial with the objections Andrews' counsel made before and after she testified.  Furthermore, our analysis of this issue would be the same whether Sheila or Gary Kennedy testified.  Accordingly, the relevant issue is whether the circuit court erred in admitting victim impact evidence arising from an unrelated crime over Andrews' objection.  If the evidence was improperly admitted, the burden would not be upon Andrews to show that its admission was prejudicial, but upon the Commonwealth to show that the court's error in admitting the evidence was harmless because no prejudice could have resulted.

In Virginia, "the death penalty may not be imposed unless the trier of fact finds one or both of the two aggravating factors that we have referred to as 'vileness' and 'future dangerousness.' " Schmitt v. Commonwealth, 262 Va. 127, 149, 547 S.E.2d 186, 201 (2001), cert. denied, 534 U.S. 1094 (2002).  We have held that evidence of unadjudicated criminal

conduct is admissible to determine a defendant's future dangerousness because it has a tendency to show that the accused would commit criminal acts of violence in the future. See Walker v. Commonwealth, 258 Va. 54, 64-65, 515 S.E.2d 565, 571 (1999), cert. denied, 528 U.S. 1125 (2000); Stockton v. Commonwealth, 241 Va. 192, 209-10, 402 S.E.2d 196, 206 (1991), cert. denied, 502 U.S. 902 (1991).  We have also held that victim impact testimony regarding a capital offense is admissible because it is probative of the depravity of mind component of the vileness predicate.  See Weeks v. Commonwealth, 248 Va. 460, 476, 450 S.E.2d 379, 389-90 (1994), cert. denied, 516 U.S. 829 (1995).  Victim impact testimony regarding unadjudicated criminal conduct, however, is not relevant to the vileness predicate because the testimony concerns an offense unrelated to the capital offense upon which the defendant is being sentenced.

Code § 19.2-264.4, in pertinent part, provides that:

A. Upon a finding that the defendant is guilty of an offense which may be punishable by death, a proceeding shall be held which shall be limited to a determination as to whether the defendant shall be sentenced to death or life imprisonment. . . .

A1. In any proceeding conducted pursuant to this section, the court shall permit the victim, as defined in § 19.2-11.01, upon the motion of the attorney for the Commonwealth, and with the consent of the victim, to testify in the presence of the accused regarding the impact of the offense upon the victim.

(Emphasis added.)  The plain language of this statute limits victim impact testimony to "the impact of the offense," referring to an "offense which may be punishable by death." Accordingly, as a matter of law, victim impact testimony at a proceeding held in a capital murder trial to determine whether the defendant shall be sentenced to death or life imprisonment is limited to the testimony of the victims, as defined in Code § 19.2-11.01(B), of the capital offense for which the defendant has been found guilty.[20]

In this case, neither Kennedy nor her father was a victim of the capital murders for which Andrews had been found guilty.  Kennedy's testimony, by the Commonwealth's own admission at trial, was solely presented as victim impact testimony of unrelated and unadjudicated criminal conduct.  We therefore hold that the circuit court erred in admitting Kennedy's testimony.  Moreover, because it is self-evident that the jury could have based its penalty-determination verdict imposing the death sentences on Andrews based in part

---

[20] Generally, the victim is defined in Code § 19.2-11.01(B) as a person "who has suffered physical, psychological or economic harm" as the result of the commission of a criminal act and includes, among others, the child of that person.

on consideration of this improperly admitted evidence, we cannot say that this error was harmless. Accordingly, we must vacate the death sentences and remand the case for a new penalty-determination proceeding.

Because we have determined that there was reversible error in the penalty-determination phase of Andrews' trial which will necessitate a remand for a new penalty-determination proceeding, we need not conduct the inquiry prescribed by Code § 17.1-313(C) "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor" and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Atkins v. Commonwealth, 257 Va. 160, 179-80, 510 S.E.2d 445, 457 (1999). Nonetheless, we will briefly address additional issues concerning the conduct of the penalty-determination phase of the trial that are likely to have relevance on remand. Id. at 180, 510 S.E.2d at 457; see also Powell, 261 Va. at 535, 552 S.E.2d at 357.

### C. Exclusion of Mitigating Evidence

As stated in the opening brief, the assignments of error that Andrews addresses under his eighth question presented are:

93

29. The trial court erred in preventing Andrews from introducing relevant and material testimony from Gary Bass of the Virginia Department of Corrections.

30. The trial court erred by excluding relevant mitigating evidence.

113. The trial court erred in excluding the relevant mitigating testimony of Caroline Long Burry at the penalty phase.

115. The trial court erred in excluding mitigating evidence of a poem that Andrews wrote.

116. The trial court erred in preventing Andrews from admitting and publishing to the jury the box containing his father's remains as mitigation evidence.

117. The trial court erred in preventing Andrews from presenting relevant testimony to rebut the prosecution's allegation that Mr. Andrews would constitute a "continuing serious threat to society."

### i. Admission of Cremains[21]

Taymullah, Andrews' mother, testified that when Andrews was 14 years old, his father was murdered while on death row in a penitentiary in Texas. After the father was cremated, Taymullah suggested to her sons that they scatter their father's cremains at a local reservoir, but Andrews resisted the idea. Instead, Andrews kept the box of cremains in his

---

[21] Cremains, commonly referred to as ashes, are the human remains collected following cremation of the body. See, e.g., Code § 54.1-2808.1; Shilling v. Baker, 279 Va. 720, 727-28, 691 S.E.2d 806, 810-11 (2010).

room and eventually carried them around in a backpack "[e]verywhere he went."

When Andrews' counsel attempted to show the box of cremains to the jury, the circuit court inquired about the relevance of doing so.  Andrews' counsel acknowledged, "I'm not trying to prove anything," but maintained that the cremains had a "dramatic effect" on Andrews' life and that his mother should be allowed to take the box of cremains from the backpack and show it to the jury.  The Commonwealth questioned the probative value of showing the jury the cremains and argued that it was "calculated purely to appeal to the emotion of the jurors."  The court agreed that showing the jury the box of cremains was "not probative of anything," but ruled that it would allow Taymullah to look inside the backpack and identify the box of cremains as those that Andrews carried around with him.

In accord with the circuit court's ruling, Taymullah looked inside Andrews' backpack and testified that the black box inside contained Andrews' father's cremains.  Photographs of the backpack and the black box then were introduced into evidence without objection.

Andrews contends that the box of his father's cremains is "powerful mitigating evidence."  Apart from "squeamishness," Andrews maintains there was no reason for the circuit court to

prevent the jury from seeing this significant item of his life history. Andrews asserts that if a defendant has "no right to sanitize" the evidence against him, then the Commonwealth has no right to sanitize a defendant's mitigation evidence. Andrews recognizes the unsettling and disturbing nature of presenting physical evidence of human remains, but asserts that the box of cremains is a critical part of his background and character which the jury was entitled to see.

The Commonwealth responds that the effort to show the box of cremains to the jury was probative of no particular fact and was attempted only to provoke an emotional reaction from the jury. The Commonwealth alleges that Andrews' counsel conceded this at trial with the statement, "I'm not trying to prove anything." In any event, the Commonwealth contends that Andrews can show no prejudice from the circuit court's ruling in light of the testimony of his mother that he carried the box of cremains around in his backpack.

After Taymullah testified, a photograph of the box was entered into evidence. Thus, the jury was only denied the opportunity to see the actual box of cremains. We cannot see, nor has Andrews established, how showing the jury the actual box of cremains would have any probative value. Accordingly, we hold that the circuit court did not err in preventing the jury from seeing the box of cremains.

## ii. Admission of Andrews' Poem

Taymullah also testified that Andrews loved to write poetry. Andrews' counsel attempted to introduce into evidence a poem that Andrews purportedly had written before the crimes:

> I've been struggling in this smokeless fire for 19
> years
> over my lifetime I shed my pain through unwanted
> tears
> been through hell back burning since adalescence
> [(sic)]
> will I enter heaven or return for final destination
> born into a world filled with complete darkness
> didn't understand love so my heart hardened
> forereal forreal [(sic)]

The Commonwealth objected to the poem as hearsay. Andrews' counsel argued that it was not hearsay because it was "not offered for the truth of the matter asserted." Rather, it was "offered to show that he writes poems and things of that nature." The circuit court ruled that the poem was inadmissible.

Andrews contends that the poem was not hearsay because it was not offered for the truth of the matter asserted because he was obviously not seeking to prove that he had been in "a smokeless fire for 19 years" or that the world is "filled with complete darkness." Rather, Andrews maintains that the poem was offered to reveal his character and to give the jurors a glimpse of his personality. Moreover, Andrews asserts that

97

the poem was highly relevant to the jurors' sentencing decision and that "virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." Tennard v. Dretke, 542 U.S. 274, 285 (2004) (internal quotation mark omitted); Lockett v. Ohio, 438 U.S. 586, 608 (1978). Andrews stresses that since the Commonwealth repeatedly portrayed him as a "killing machine," it was error to exclude this evidence of his "humanity, insight, thoughtfulness, and feelings."

The Commonwealth responds that the poem was nothing more than self-serving hearsay, not subject to cross-examination. The Commonwealth also contends the poem was cumulative evidence because it was not probative of any fact not established by his mother's testimony that Andrews wrote poetry. The Commonwealth finally contends that Rule 5:25 bars Andrews' assertion that the content of the poem would influence the jurors in their decision about whether his life was worth preserving.

We have repeatedly held that "[a]n out-of-court statement not admitted for 'the truth of the matter asserted' is not hearsay, and therefore is not barred by the general rule against the admissibility of hearsay." Hodges v. Commonwealth, 272 Va. 418, 432, 634 S.E.2d 680, 687 (2006). In this case, the poem was offered as evidence of Andrews'

character; it therefore was not barred by the hearsay rule. Moreover, Andrews should have been able to present the poem as mitigating evidence against the Commonwealth's remarks that Andrews was a "killing machine." Finally, the poem itself was not cumulative of the fact that Andrews wrote poetry because the jury was not given the opportunity to hear or read the type of poetry Andrews wrote and give weight, if any, to its mitigating effect. For these reasons, we hold that the circuit court erred in excluding the poem from evidence, and its admission will not be barred in the new penalty-determination proceeding.

### iii. Testimony of Gary Bass

The Commonwealth objected to the anticipated testimony of Gary Bass, Chief of Operations for the Virginia Department of Corrections. The Commonwealth argued that Bass' anticipated testimony about general prison conditions was prohibited under our decision in Walker, 258 Va. at 70, 515 S.E.2d at 574-75, excluding so-called "prison life" evidence. See also, e.g., Burns, 261 Va. at 338-40, 541 S.E.2d at 893; Cherrix v. Commonwealth, 257 Va. 292, 310, 513 S.E.2d 642, 653, cert. denied, 528 U.S. 873 (1999). Andrews' counsel responded that Bass would testify to how co-defendants such as Andrews and Crawford will not have contact with each other in prison. Andrews' counsel then made a specific proffer of Bass'

99

testimony concerning the various levels of prison security that Andrews would be designated to if sentenced to life without parole. The Commonwealth again objected to Bass' proposed testimony, arguing that it was about general prison conditions, which are not relevant to the future dangerousness inquiry.

The circuit court limited Bass' testimony to two questions: (1) whether Bass was aware of policies and procedures of management of inmates within the Department of Corrections, and (2) whether steps will be taken to segregate Andrews from an individual with whom he had a negative contact in the past. During Bass' testimony, the court allowed an addition question: whether these policies of the Department of Corrections have been successful in the past. The court disallowed any additional questions regarding prison life testimony.

During its closing argument, the Commonwealth made the following statements:

> If [Andrews] is given life in prison, one day
> there's going to be an error. Guards are going to
> get too close, an inmate is going to get too close,
> the door is going to be accidently left open and the
> Defendant is going to act again.
>
> . . . .
>
> Now, if the Defendant is given life in prison, he's
> going to be in a prison. He's going to have a day-

to-day life. And who knows whether that's good or bad; I suspect it's not (unintelligible).

But there's always that possibility that during the period in time that he's imprisoned that he'll have a good day. Food['s] better than it used to be, a visitor came, guards didn't hassle me today, got to watch T.V., something. There's a possibility if the Defendant is given life in prison that he's going to have a good day.

He doesn't deserve a good day. The victims don't get that. He took everything these victims had and everything they ever will have. You see the prison can't treat him inhumanly. They've got to treat him – they've got to feed him, they've got to give him some recreation. They've got to take care of him. There's a possibility he's going to have a good day.

Andrews' counsel moved the circuit court to reopen the case and allow Bass to testify, arguing that the Commonwealth "open[ed] the door" when it talked about "what [a] day in the life of prison would be and how there could be a good day in prison and discussed prison life testimony" that Andrews was not allowed to provide. The court agreed to instruct the jury to disregard the statements made by the Commonwealth concerning prison life evidence and to consider only the evidence "from Mr. Bass and the Department of Corrections."

The circuit court then asked the Commonwealth's Attorney if he was going to make any references to prison life in his rebuttal. The Commonwealth's Attorney replied, "I am indeed." The court stated it would therefore give the instruction after the closing arguments had concluded. Andrews' counsel asked

101

that the Commonwealth not be allowed to make any further argument regarding prison life during rebuttal. The court responded, "We'll see what he says. If he . . . says something inappropriate, we'll deal with it."

During the Commonwealth's rebuttal, the circuit court overruled Andrews' further objection to the interjection of commentary on prison life after the Commonwealth asserted to the jury that "[t]here is no safe haven for [Andrews.] There is no locking him up and throwing away the key and forgetting about it." Before submitting the case to the jury, the court instructed the jurors to "disregard any of [the Commonwealth's] arguments or statements regarding prison life."

We have consistently held that evidence of general prison conditions is not relevant to the future dangerousness inquiry. See Morva, 278 Va. at 350, 683 S.E.2d at 565; Porter, 276 Va. at 247-52, 661 S.E.2d at 437-40; Juniper, 271 Va. at 427, 626 S.E.2d at 424. Accordingly, we reject Andrews' bare assertion that our prior cases were wrongly decided and find that the circuit court properly excluded Bass from testifying regarding general prison conditions such as the various security measures utilized in maximum security facilities. However, when the Commonwealth acknowledged that it would reference general prison conditions during its

102

closing, the court should have been proactive and prohibited the Commonwealth from doing so, instead of taking a "wait-and-see" approach.  Moreover, having already decided to give a curative instruction after the first instance of improper argument, the court clearly should have prevented the Commonwealth from making any additional improper arguments of the same type.[22]

Having persuaded the circuit court to prevent Andrews from presenting general prison life evidence, the Commonwealth gained an unfair advantage in referring to prison conditions in its closing.  Even after the court had ruled that such argument was improper, the Commonwealth's Attorney's emphatic assertion that he would return to the topic in his rebuttal demonstrates the importance the Commonwealth placed on this aspect of its argument in impressing upon the minds of the jurors the possibility that sentencing Andrews to life in

---

[22] It is not necessary today to address whether the Commonwealth "opened the door" to prison life evidence by referring to general prison conditions in its closing argument.  Nevertheless, we observe that the doctrine of "curative admissibility" allows a party to introduce otherwise inadmissible evidence, such as prison life evidence, when necessary to counter the effect of improper evidence or argument previously presented by the other party.  See Elliott, 267 Va. at 417, 593 S.E.2d at 284.

prison would be inadequate to protect society or sufficiently punish him for his crimes.

Because the necessity for remand on other grounds effectively moots the question of whether the circuit court properly exercised its discretion by only giving a curative instruction to the jury rather than permitting Andrews to reopen the case to allow Bass to testify on "prison life" topics, we express no opinion thereon. However, we reiterate that in this case it was plain error to delay giving the instruction and to permit the Commonwealth to compound the error that necessitated that instruction during its rebuttal argument.

### iv. Testimony of Dr. Caroline Long Burry

Andrews contends that the circuit court erred in excluding relevant mitigating evidence from Dr. Caroline Long Burry, associate professor at the University of Maryland's School of Social Work. Dr. Burry was prepared to testify regarding the risk factors and protective factors that have been identified by the Department of Justice as predictive of future violent conduct in youth. Andrews' counsel proffered that once Dr. Burry identified those factors and established the empirical framework, then it would be left to the jury to determine which factors applied to Andrews and to determine the mitigating value of those factors. Andrews' counsel later

104

explained that Dr. Burry's testimony was not offered to predict future dangerousness, rather it was offered as mitigation evidence to show Andrews' "background and circumstances as a child" and the likely violence in his future based on the risk factors.

The circuit court excluded Dr. Burry's testimony, reasoning that her testimony, based solely on empirical data, was not admissible because it is not particularized to Andrews. The court, however, allowed Andrews to proffer a record of Dr. Burry's testimony.

Outside the presence of the jury, Dr. Burry testified to the risk factors that the Department of Justice has identified in youth that are predictive of future violent conduct. Before doing so, Dr. Burry stressed that the risk factors are cumulative, meaning an individual with more risk factors is more prone to later violence. Dr. Burry identified individual risk factors such as hyperactivity, lack of concentration, restlessness, risk-taking, aggressiveness, early initiation of violent behavior, nonviolent antisocial behavior, and favorable attitudes toward antisocial or deviant behavior. Dr. Burry next identified family risk factors such as parent criminality, child neglect and abuse, parental substance abuse, parent/child separation, and instability. Dr. Burry further identified risk factors related to education, peer

groups, and community.  Finally, Dr. Burry identified counterbalancing protective factors such as intelligence, positive social orientation, resilient temperament, and attachment to pro-social family members that make future violent conduct less likely even when risk factors are present.

Andrews contends that given the mitigation evidence they heard regarding his background, the jurors could have put Andrews into a framework of risk factors versus protective factors.  Andrews maintains that Dr. Burry's testimony would have enabled the jury to understand that, through no fault of his own, Andrews was subject to many of these risk factors.  For example, Dr. Burry testified that "none of these [risk factors] are a youngster's choice.  You know, your family is your family.  You don't choose to be maltreated.  You don't choose to have a parent be a criminal or a parent abusing substances."  Andrews asserts that Dr. Burry's testimony would have helped the jury to understand why his horrific and traumatic background diminishes his moral culpability.  According to Andrews, this is the essence of mitigating evidence and should not have been denied.  See Penry v. Lynaugh, 492 U.S. 302, 319 (1989) ("[E]vidence about the defendant's background and character is relevant because of the belief, long held by . . . society, that defendants who

106

commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." (internal quotation marks omitted)).

The Commonwealth responds that the circuit court properly excluded Dr. Burry's testimony.  The Commonwealth contends her evidence was not admissible to rebut the claim of Andrews' future dangerousness because it was evidence about the dangerousness of other offenders.  Moreover, the Commonwealth asserts that her testimony was not relevant because it related to factors in juveniles that predict violent conduct, but it was never proffered that her evidence would have any scientific validity to predict that the then 27-year-old Andrews would not be violent.  Finally, the Commonwealth maintains that the jurors needed no expert assistance in order to determine whether the disturbing facts of Andrews' life provided a reason to sentence him to life instead of death. We disagree.

A defendant in a capital case has the constitutional right to present virtually unlimited relevant evidence in mitigation.  See Tennard and Lockett, supra.  The Commonwealth misconstrues the point of Dr. Burry's mitigating evidence testimony.  As Andrews' counsel made clear at trial, Dr. Burry's testimony was not offered as rebuttal to the future dangerousness inquiry.  Instead, Dr. Burry's testimony was

107

offered to explain Andrews' background and to show that the person he is today was the product of forces beyond his control. We are of opinion that this mitigating evidence presents an issue regarding the weight of the evidence, a question for the jury, rather than the admissibility or relevance of the evidence. We hold that the circuit court erred in excluding the testimony of Dr. Burry in its entirety. Accordingly, upon remand, Andrews will be permitted to introduce evidence such as that proffered generally by Dr. Burry for the purpose of mitigation.

### D. Prosecutorial Misconduct

As stated in the opening brief, the assignments of error that Andrews purports to address under his tenth question presented are:

> 26. Andrews' rights were violated when the prosecutor made improper arguments that were based upon facts not in evidence.

> 27. The trial court erred in refusing to prevent the prosecutor from making improper references to prison conditions during closing arguments.

> 28. The prosecuting attorneys violated Andrews' rights by making improper remarks that were calculated to arouse prejudice and biases against Andrews.

> 118. The prosecuting attorneys violated Andrews' rights by improperly purporting to speak for the victims and their families in asking the jury to return a sentence of death.

119. The prosecuting attorneys violated Andrews' rights by referring to facts not in evidence and using rhetoric intended to inflame the passions and biases of the jury at the penalty phase.

Because at the time of the errors alleged in assignments of error 26, 28, and 119 Andrews failed to timely object, timely ask for a cautionary instruction, or timely move for a mistrial, we will not consider his arguments with regard to these issues.  Rule 5:25; Schmitt v. Commonwealth, 262 Va. 127, 148, 547 S.E.2d 186, 200-01 (2001), cert. denied, 534 U.S. 1094 (2002) ("Unless a defendant has made a timely motion for a cautionary instruction or for a mistrial, we will not consider his assignments of error alleging that improper remarks were made by the prosecutor.").  Similarly, on brief Andrews does not make a particularized argument concerning the alleged error by the court "in refusing to prevent the prosecutor from making improper references to prison conditions during closing arguments" as a basis for finding prosecutorial misconduct.  Accordingly, despite having concluded in the prior section of this opinion that the court erred in permitting the Commonwealth to address prison life conditions in its closing argument, we hold that Andrews has waived his right to rely upon this issue, as stated in assignment of error 27, to support his claim of prosecutorial

misconduct.  Rule 5:17(c)(4); Rule 5:27.  Thus, we will address only assignment of error 118.

" 'The making of improper statements in argument is reversible error, where such statements are so impressive as to remain in the minds of the jurors and influence their verdict.' " Kitze v. Commonwealth, 246 Va. 283, 288, 435 S.E.2d 583, 585 (1993) (quoting McLane v. Commonwealth, 202 Va. 197, 205, 116 S.E.2d 274, 281 (1960)).  In his opening brief, Andrews provided a citation to the joint appendix indicating the point in the closing argument he contends the Commonwealth purported to speak on behalf of the victims and their families.  The citation provided, however, is to a portion of Andrews' counsel's closing argument.  We have reviewed the Commonwealth's entire closing argument and we have concluded that Andrews' argument is most likely directed toward the following statement made by the Commonwealth toward the end of its closing argument following the assertion that Andrews would have "good days" in prison:

> The victims don't even get the prospect, the possibility, they don't get the prospect of a good day, the possibility of that.  They don't get a fraction of the life that this Defendant gets.  They get nothing.  They don't get the opportunity to cope with their surroundings.  He does.  The victims['] lot in these cases are not even []comparable to the Defendant.  He gets life; they get death.  It's really what we're talking about here, folks.  No one can call that justice.

110

It would mean that the value of the victims or the dignity of the victims as compared to this Defendant's was exceedingly small. Exceedingly small. There are victims and there's families of victims and those grief stricken survivors confronted with butcher[y] of the Defendant – the butchery of someone who's near and dear.

What capital punishment says to those folks is we take your loss seriously. We value these victims. We know that these victims are filled with rage and pain.

Contrary to Andrews' assertion that the Commonwealth purported to speak for the victims and their families, the context of the prosecutor's statements was a proper comment on victim impact as it relates to the sentencing decision to be made by the jury. Cf. Weeks v. Commonwealth, 248 Va. 460, 476, 450 S.E.2d 379, 390 (1994), cert. denied, 516 U.S. 829 (1995). Thus, based upon our review of the record, we cannot say that Andrews was "substantially prejudiced" by the prosecutor's statement during closing argument. See Avent, 279 Va. at 204-05, 688 S.E.2d at 260-61.

## VI. CONCLUSION

For these reasons, we will affirm Andrews' convictions for capital murder and the other felony convictions and terms of imprisonment imposed thereon. We will vacate the four death sentences, and remand the case for a new penalty-determination proceeding to be conducted consistent with the views expressed in this opinion on the two convictions under

111

Code § 18.2-31(4) and, at the Commonwealth's election, the conviction under either Code § 18.2-31(7) or Code § 18.2-31(8).

> Record No. 100374 – <u>Affirmed in part, vacated in part, and remanded</u>.
>
> Record No. 100375 – <u>Affirmed</u>.